MAYOR AND ALDERMEN OF WORCESTER *vs.* BOSTON AND ALBANY RAILROAD COMPANY & others.

Worcester.    October 2, 1916. — January 8, 1917.

Present: LORING, BRALEY, CROSBY, & PIERCE, JJ.

*Railroad,* Abolition of grade crossings. *Worcester. Boston and Albany Railroad Company. Practice, Civil,* Auditor. *Evidence,* Presumptions and burden of proof. *Words,* "Masonry," "Reinforced concrete."

In proceedings under St. 1900, c. 387, for the abolition of grade crossings in Worcester, where a decree confirming a decision of the commissioners appointed under the statute ordered that the Boston and Albany Railroad Company should construct over Green Street in Worcester a "masonry arch bridge" and where at a hearing before an auditor there was a direct conflict of expert testimony on the question of fact whether the bridge built by the railroad company, which consisted of an arch made of ribs of steel encased in concrete, was or was not a "masonry arch bridge," and the auditor found that it was such a bridge, it was *held,* that this was a case where the finding of the auditor who saw the witnesses was entitled to great weight and that the finding must stand unless it was plainly wrong, and that on the evidence reported the finding of the auditor was not plainly wrong.

In the case above described, it also was *held* that it was within the discretion of the auditor to refuse to receive evidence as to other bridges built under the decision of the commissioners.

In the same case it also was *held* that in obeying the decree it was the duty of the railroad company as a common carrier to see to it that the bridge built over Green Street was of the kind, and built in the way, requisite to carry the travelling public in safety and that as to the cost incurred in the construction of the bridge the question the auditor had to decide was whether the engineers of the railroad company in doing what they did acted in good faith in the exercise of the discretion vested in them, and that therefore it was right for the auditor to refuse to rule that the railroad company must show that the cost of the bridge built by it "does not exceed what was reasonably expended in carrying out the terms of the decree."

In the same case it was *held* that it was right for the auditor to refuse to rule that the railroad company must show "that in building the Green Street bridge it

exercised due care and diligence to protect the interests of the contributing parties," and to rule instead that "If the discretion vested in the railroad company was properly exercised, the question of due care and diligence toward the contributing parties does not arise. The interests of those parties are subordinate to the duty of the railroad to provide a safe bridge and one not subject to unreasonable interruption, and those interests were properly cared for by properly exercising the discretion given."

In the same case the auditor adopted the following ruling: "If the design chosen conforms to the requirements of the decision, and if it was adopted in good faith after reasonable investigation and study, the discretion exercised by its choice will not be revised, unless it clearly appears that this discretion has been abused, and that evidence, sufficient to warrant a finding that such discretion has been abused, must be of a stricter standard than is described by the word 'preponderance.' It must 'clearly appear' that the discretion had been abused." It was *held* that the above instruction in regard to the burden of proof was erroneous and misleading; that the Boston and Albany Railroad Company, which had constructed the bridge, had asked the assistance of the court to compel another railroad company, the Commonwealth and the city of Worcester to pay their respective shares of the cost of the work done by it under the decree abolishing the grade crossing, and that accordingly the burden was upon it to show that, in exercising the discretion committed to it, it had acted in good faith; although, if it acted lawfully and in good faith, its conclusion arrived at in regard to the manner of building the bridge could not be revised by any person or tribunal.

In the same case it also was *held* that a finding of the auditor, approving the use by the railroad company of crushed stone, instead of gravel at about half the cost, for ballasting the surface of the bridge, where the decree required that the main tracks of the railroad should "be reconstructed with suitable rails, ties and ballast," could not be said to be wrong in the absence of the evidence on which the finding was made.

In the same case it was *held* that an allowance by the auditor of $467 paid by the railroad company for the removal to a new location of certain poles and wires of the Western Union Telegraph Company, which was an incident of the work required by the decree, was proper.

PETITION, filed in the Superior Court for the county of Worcester on October 18, 1900, by the mayor and aldermen of the city of Worcester under St. 1900, c. 387, to abolish the grade crossings named in that statute. Commissioners were appointed, who on June 18, 1907, filed their decision prescribing the manner in which the crossings were to be abolished, and their decision was affirmed by a decree of the Superior Court. Under St. 1906, c. 463, Part I, § 39, an auditor was appointed to audit all accounts of expense incurred by any of the parties in the case, and such auditor from time to time filed reports upon various statements of expenditures submitted to him by the parties who had done the work necessary to carry out the decision of the commissioners and the decree confirming it.

The case came on for hearing before *Wait*, J., on the exceptions of the Commonwealth and of the New York, New Haven, and Hartford Railroad Company to the auditor's seventy-first report. The judge made an order that the exceptions should be overruled and the report confirmed, but, being of opinion that this order so affected the merits of the controversy that the matter ought before further proceedings to be determined by this court, he reported the case for such determination. If the order made by the judge was proper, it was to be affirmed; otherwise, such order or decree was to be entered as justice and equity might require.

*H. W. Barnum,* Assistant Attorney General, for the Commonwealth.

*R. G. Dodge,* for the New York, New Haven, and Hartford Railroad Company.

*R. A. Stewart, (E. S. Kochersperger* with him,) for the Boston and Albany Railroad Company and the New York Central and Hudson River Railroad Company.

LORING, J. This case comes before us upon exceptions to the seventy-first report of the auditor appointed in proceedings to eliminate grade crossings in the city of Worcester. The exceptions here in question were taken by the Commonwealth and by the New York, New Haven, and Hartford Railroad Company hereinafter called the New Haven. The New Haven's exceptions are based upon the contention (1) that the bridge over Green Street built by the Boston and Albany Railroad Company, hereinafter called the Albany, is not the kind of bridge which it was authorized to build by the decision of the commissioners affirmed by the decree of the Superior Court and (2) that the cost of it was excessive. The exceptions taken by the Commonwealth include those taken by the New Haven and in addition attack the use of broken stone as ballast and the allowance by the auditor of $467 paid by the Albany for moving from its location (as it existed before the elimination of the grade crossings in question) certain poles and wires of the Western Union Telegraph Company.

Green Street is situate eight hundred fifty feet west of the new Union Station and at the end of the station platform. Formerly it was crossed at grade by the tracks of two branch lines of the New Haven and by the tracks of the main trunk line of the Albany. The provision contained in the commissioners' decision

with relation to the Green Street bridge is in these words: "Green Street shall be graded to its full width at the grades hereby established and the railroad shall be carried over the street by a masonry arch bridge of water tight construction, with abutments built upon the lines of the street, and having a clearance of sixteen (16) feet from the crown of the street to the soffit of the arch on its centre line." This provision in terms relates to the Albany only. But by reference it was made applicable to the New Haven. At the bridge the locations of the Albany and of the New Haven are sixty-nine feet, eight inches and sixty-four feet, four inches wide. A requirement of the commissioners that there should be a stairway leading from the level of the tracks to Green Street prevented the two railroads building bridges covering these locations. The commissioners provided that that stairway should be built in part on each location. This was found to be impracticable and by agreement of the two railroad companies the line between the locations of the two was changed so as to bring the stairway entirely within that of the Albany. The result was that the width of the bridge built by the Albany was seventy-three feet, seven eighths of an inch and that by the New Haven sixty feet, eleven and one eighth inches. When completed the two bridges made one uniform structure in appearance. The bridge built by the New Haven road cost $28,210.21. That built by the Albany cost $132,279.54.

The history of the matter was as follows: For reasons connected with the continued operation of both railroads the New Haven's bridge was built first. It was finished some time in June, 1910. For about a year it was used by the Albany as well as by the New Haven. In the early part of 1909 (more than a year before the New Haven bridge was completed) a conference as to the plans of the bridges to be built by the two railroads was held by the engineers of the two roads (Messrs. Wheeler and Morrill, for the New Haven and Stone and Chamberlain for the Albany). A sketch was first drawn up by the Albany and a section in accord with that sketch was then drawn up by the New Haven. The New Haven then designed an arch and prepared a plan for the bridge which was sent to the Albany. Later these plans were returned to the New Haven without objection. The bridge set forth in these sketches and plans was a reinforced concrete arch

bridge and that was the kind of a bridge afterwards built by the New Haven. It is not pretended that any agreement as. to the bridges to be built by the two railroad companies came into existence as the result of these conferences. By the latter part of 1909 Freeman had succeeded Stone as chief engineer of the Albany. In October he took up the plan and sketches which had been made for the Green Street bridge. He thought that the distance from the springing line of the crown of the arch was shallow when taken in connection with the span and thickness of the arch ring. It appears that the space between the soffit of the arch and the crown was three feet, seven and eleven sixteenths inches and to the top of the rail was five feet, three and seven eighths inches and that the true length of the span of the bridge was eighty-two feet, eight and three fourths inches. The auditor found that the bridge does not cross Green Street at a right angle and that this is the true length of the span. Freeman thereupon ordered his engineer of construction to make a careful investigation in order to make sure that a reinforced concrete arch bridge could be built under the conditions imposed by the decision. This investigation began in July, 1911, and continued until the autumn of that year. At first it was along the lines of a reinforced concrete arch bridge of the same character as that built by the New Haven. This part of the investigation covered two months. Modifications of the New Haven type also were investigated. In addition different types of bridge were taken under consideration. The whole investigation to ascertain the type of bridge which ought to be built at Green Street lasted six or seven months. The result of the investigation convinced the engineers (1) that it was not practicable to build a bridge of the kind built by the New Haven and (2) that the proper bridge to be built was a bridge consisting of an arch made of steel ribs, the steel arch to be encased in concrete, the arch being designed to carry all the load and the concrete (in which it was encased) being designed to give lateral stiffness to the arch to distribute the load so that it would come upon the arch and to protect the steel. While the steel arch was designed to carry all the load, the arch would not have constituted a completed bridge without the concrete. If the concrete had not been used, the steel arch would have had to be braced by steel bars to add the necessary lateral stiffness to the arch and in that

way to make a complete bridge. The steel used in the Albany bridge (including the abutments and the stairway) cost $51,223.05, or forty and six tenths per cent of the whole cost, and amounted to one hundred twelve cubic yards or one and seven tenths per cent of the whole, while the concrete cost $74,497.86 or fifty-nine and four tenths per cent and amounted to sixty-three hundred and sixteen cubic yards or ninety-eight and three tenths per cent. The auditor goes at great length into the details (1) of construction of the two bridges, (2) of the investigation carried on by Freeman and his assistants and (3) of the conclusion reached by them as to the necessity of building the kind of a bridge which they. built. We cannot set forth these matters in detail. It is enough to say that the auditor in effect found as a fact that Freeman and his assistants acting in good faith were convinced by this investigation (extending over a period of six or seven months) that they ought not to build a bridge of the New Haven type and that the bridge which they built was the proper type of bridge to be built by the Albany. In view of the disproportion in expense it is proper however to refer to the main differences between the problems which confronted the New Haven and the Albany. In the first place the Albany bridge was twelve feet, or one fifth again wider than the New Haven bridge. In the second place the Albany bridge had to carry the tracks of a trunk line while the New Haven bridge carried the tracks of two branch lines. In the third place the locomotives of the Albany were heavier than those of the New Haven and the traffic over the bridge was more frequent and continuous. Again, the fact that the Albany had to undertake the construction of the stairway brought upon it engineering difficulties with respect to the bridge arch and its support which did not have to be encountered by the New Haven road. And finally the length of the span of the bridge as determined by the two railroad companies was quite different; the New Haven went on the assumption that the span was a square span and the Albany on the assumption that it was a "skew" span; the difference resulting in an arch seventy-two feet, two inches as computed by the New Haven in place of eighty-two feet, eight and three fourths inches as computed by the Albany. In this respect the auditor found that the Albany was right and the New Haven was wrong.

1. The first contention made by the Commonwealth and the New Haven is that the bridge built by the Albany was not a "masonry arch bridge." That is to say it was not a bridge of the type which the commissioners' decision directed the Albany to build. This objection was taken for the first time during the arguments before the auditor after the evidence had been closed. Up to that time no evidence had been introduced by either party bearing directly upon this question. Counsel for the Commonwealth and for the New Haven took the position then that from the description of the bridge given by the Albany's witnesses the bridge built by it was not a "masonry arch bridge." They pointed out for example that counsel for the Albany during the course of the hearing in answer to this question from the auditor, "Is this a steel bridge?" said, "A ribbed steel bridge, encased in concrete, as I understand it."

When this argument was put forward by the New Haven, counsel for the Albany asked to have the hearing reopened. Thereupon the auditor reopened the hearing and evidence was introduced by both parties bearing directly upon the question whether the bridge built by the Albany was or was not a "masonry arch bridge." This was a question of fact depending upon what in the trade or rather (speaking with greater accuracy) in the profession of a civil engineer was meant by the requirement that a "masonry arch bridge" should be built. On this question there was a direct conflict of testimony. After hearing the testimony the auditor found that the Albany bridge was a "masonry arch bridge."

It is the contention of the Commonwealth and of the New Haven road that this finding was wrong.

Their first contention is that this case comes within the doctrine of *Harvey-Watts Co.* v. *Worcester Umbrella Co.* 193 Mass. 138 and cases following it; for the last case on the point see *Mansfield* v. *Wiles*, 221 Mass. 75, 84. But we are unable to accept that view of the matter. Two of the experts who testified upon the question after the hearing had been reopened had testified as experts for the Albany at the original hearing. And the objecting parties have contended with great insistence that the testimony given by three experts at the reopened hearing was inconsistent with the testimony originally given by them. Whether these witnesses were

or were not sincere in the testimony which they gave at the re-opened hearing depended to a great extent upon their appearance and bearing as witnesses when they gave the subsequent testimony. That argument disposes of the contention that this case comes within *Harvey-Watts Co.* v. *Worcester Umbrella Co.* This is eminently a case where the finding of the auditor who saw the witnesses and gave credit to the testimony given at the later hearing is entitled to great weight.

The question therefore with respect to the finding of the auditor that the bridge built by the Albany was a "masonry arch bridge" must stand unless it is plainly wrong. In deciding whether the bridge built by the Albany was or was not a "masonry arch bridge" the auditor had to choose between the testimony given by the experts called by the Albany and that given by those called by the New Haven. There was a direct conflict between the two. The argument of the New Haven is in effect that the bridge built by the Albany does not come within the classification of a "masonry arch bridge" because it is a bridge where the steel arch carries the load and all that the concrete does is to distribute the load so as to throw it upon the steel arch and to take care of lateral stresses. But the question to be decided by the auditor was not whether the bridge built by the Albany ought to have been called a "masonry arch bridge." The question he had to decide was whether within the terminology of the profession of a civil engineer it was in fact a "masonry arch bridge." On this point the testimony of one of the experts of the Albany is illuminating. From that testimony it appears that the word "masonry," like most terms in applied science, has been subject to the processes of evolution as indeed science itself has been subject thereto. Originally "masonry" meant a construction made of stone laid with or without mortar between the joints and consisting either of large or small stones. At that time it meant "dressed stone" as distinguished from "rubble masonry" which included stones of any shape. Later on as concrete came into use "masonry" was extended to include "what is called concrete," that is to say, where the volume of mortar is increased above what it was in the case of dressed stones with mortar joints and where the stones were of any shape or size and were mixed together with cement. The result in that case came to be known as "ma-

sonry." Then, as concrete has a small resistance to tension or pull, the concrete was reinforced by steel bars to resist compression and there came into being the term "reinforced concrete." And "reinforced concrete" is "universally termed 'masonry.'" Included in this reinforced concrete were arches of the "Melan" system, and the bridge built by the Albany (although there was a direct conflict in the testimony on this point) was "essentially a Melan arch."

The auditor refused to go into evidence as to other bridges built under the decision here in question. It was within his discretion to reject this evidence.

We are of opinion that the finding of the auditor that the bridge built by the Albany was "a masonry arch bridge" was not plainly wrong. We state the proposition in these terms not because we hesitate to adopt the finding of the auditor on this point, but because that is the form in which (under the rule governing such a finding) the question to be decided is presented to us.

2. The next contention of the Commonwealth and of the New Haven is that the cost of the Albany bridge was excessive. They asked the auditor to rule that the burden of proof was upon the Albany to show by a fair preponderance of the evidence (1) that the cost of it "does not exceed what was reasonably expended in carrying out the terms of the decree" and (2) that in building the bridge the Albany "exercised due care and diligence to protect the interest of the contributing parties." The auditor refused to adopt these rulings.

We are of opinion that in refusing to adopt these rulings the auditor was right. The commissioners for the elimination of the grade crossings here in question did not undertake to determine how the bridge to be built by the Albany was to be built by it. They went no further than to provide that the bridge should be a "masonry arch bridge." As matter of construction of that provision of the commissioners' decision it was left to the discretion of the Albany to determine what kind of a bridge should be built and how the kind of bridge adopted by it should be built provided it was a "masonry arch bridge." The Albany was a common carrier and upon it as a common carrier was laid the responsibility of seeing to it that the public was carried in safety, including the responsibility of seeing to it that the bridge to be built by it over

Green Street was of the kind and built in the way requisite to carry the travelling public in safety. For this reason it was highly proper if not necessary for the commissioners to leave to the Albany's discretion the type of bridge to be built by it at Green Street and the method of its construction. At the hearing on this issue the New Haven put on the witness stand bridge experts who testified that in their opinion a bridge of the type built by the New Haven would have been adequate to carry the Albany traffic and would so continue for an indefinite period in the future. But the question to be determined was not whether in the opinion of an expert (upon whom the responsibility for the safe carriage of the public did not rest) that was or was not the fact. The discretion as to the type and manner of construction of the bridge at Green Street to be built by the Albany was not left to experts to be selected by the New Haven; those questions were left to the Albany, that is to say, to Freeman and his assistants. It is quite possible that the question which had to be decided by Freeman and his assistants was a question upon which experts would be likely to differ, especially if it be the fact (testified to in behalf of the Albany) that "a good many engineers at the present day are doubtful about reinforced concrete, especially for such flat arches" as the arch which the Albany had to construct. This testimony of the New Haven experts therefore was beside the mark. The question to be decided was not what the auditor should find that Freeman and his assistants ought to have done. The question the auditor had to decide was whether Freeman and his associates in doing what they did acted in good faith in the exercise of the discretion vested in them. From this it follows that the first ruling asked for by the Commonwealth and the New Haven, namely, that the Albany must show "that the cost of the Green Street structure . . . does not exceed what was reasonably expended in carrying out the terms of the decree," was refused rightly.

We are of opinion that the second ruling asked for by the objecting parties (namely "that in building the Green Street bridge it [the Albany] exercised due care and diligence to protect the interest of the contributing parties") was rightly dealt with by the auditor. The auditor first ruled that "(1) under the decision a discretion was invested in the Boston and Albany to de-

termine the design and quality of the bridge which it should erect at Green Street so far as it was not controlled by the limitations and requirements of law and the decision. This discretion, however, was one to be intelligently and carefully, but not arbitrarily exercised, and with a due regard to the burdens imposed upon the contributing parties." Later on he added this: "(4) If the discretion vested in the railroad was properly exercised, the question of due care and diligence toward the contributing parties does not arise. The interests of those parties are subordinate to the duty of the railroad to provide a safe bridge and one not subject to unreasonable interruption, and those interests were properly cared for by properly exercising the discretion given." *

Where the discretion committed to one of the parties charged with carrying out a part of a decree to eliminate grade crossings involves the safety of the travelling public (as was the fact in the case at bar) the ruling of the auditor stated above goes as

---

* The ruling of the auditor in full was as follows: "(1) Under the decision a discretion was vested in the Boston and Albany to determine the design and quality of the bridge which it should erect at Green Street so far as it was not controlled by the limitations and requirements of law and the decision. This discretion, however, was one to be intelligently and carefully, but not arbitrarily exercised, and with a due regard to the burdens imposed upon the contributing parties, (2) that it was the duty of the Boston and Albany to build at Green Street a bridge conforming not only to the provisions of statutory law and the specific or implied requirements of the decision, but one which would also be adequate to carry safely and without unreasonable interruption the burdens which it would be called upon to bear, not only under present conditions of traffic, but also those which might reasonably be foreseen would be placed upon it within a reasonable time in the future, (3) that if the design chosen conforms to the requirements of the decision, and if it was adopted in good faith after reasonable investigation and study, the discretion exercised by its choice will not be revised, unless it clearly appears that this discretion has been abused, and that evidence, sufficient to warrant a finding that such discretion has been abused, must be of a stricter standard than is described by the word 'preponderance.' It must 'clearly appear' that the discretion had been abused, (4) If the discretion vested in the railroad was properly exercised, the question of due care and diligence toward the contributing parties does not arise. The interests of those parties are subordinate to the duty of the railroad to provide a safe bridge and one not subject to unreasonable interruption, and those interests were properly cared for by properly exercising the discretion given."

far as a ruling ought to go with regard to protecting the interests of the contributing parties. The only question (if there is a question) is whether it did not go further than it ought to have gone in favor of the contributing parties. A case where the exercise of discretion involves the safety of the travelling public stands in this respect on a different footing from a case where that consideration does not exist. The case of *Mayor & Aldermen of Worcester* v. *Boston & Albany Railroad*, 213 Mass. 567, relied on by the objecting parties, belongs to the latter class. In that case the Albany made a contract for a portion of the work to be done for the elimination of the grade crossings here in question which consisted of the use of certain definite proportions of cement, sand and stone, the stone to be either broken stone or screened gravel. The engineer of the railroad company allowed the contractor to use unscreened or "run of bank" gravel in place of broken stone or screened gravel. It was contended that this was done in order to hurry the work. The use of unscreened or "run of bank" gravel resulted in a product inferior in quality and less in cost than the concrete called for by the contract. In spite of that the engineer paid the contractor the contract price. It was found by the auditor that concrete produced by "run of bank" gravel was sufficiently strong. He found that there were no circumstances which justified the substitution of the "run of bank" gravel for screened gravel and that in consenting to the substitution it failed to protect the interests of the contributing parties. This finding was upheld by this court. The question in that case was a question of getting a *quid pro quo* for money paid out. No question of the safety of the travelling public was involved. But where (as in the case at bar) there is a question of the safety of the travelling public the duty owed to the contributing parties by the common carrier who is charged with exercising a discretion as to work to be done becomes almost if not quite negligible.

We are of opinion, however, that in one respect the auditor was wrong as to the rule adopted by him under which his findings on this question were made. And we are of opinion on the whole that it cannot be said that this error has not affected the result.

The auditor adopted this ruling: "(3) If the design chosen conforms to the requirements of the decision, and if it was adopted in good faith after reasonable investigation and study, the dis-

cretion exercised by its choice will not be revised, unless it clearly appears that this discretion has been abused, and that evidence, sufficient to warrant a finding that such discretion has been abused, must be of a stricter standard than is described by the word ' preponderance.' It must 'clearly appear' that the discretion had been abused."

Where a carrier is vested with a discretion as to what ought to be done in the operation of its road that discretion exercised in good faith is not subject to be revised by any person or any body. No collection of authorities on that general proposition is necessary. See, for example, *Brainard* v. *Clapp,* 10 Cush. 6, and *Whittemore* v. *New York, New Haven, & Hartford Railroad,* 191 Mass. 392.

The Albany has invoked in support of the correctness of this part of the auditor's ruling the decision of this court in *Fall River Iron Works Co.* v. *Old Colony & Fall River Railroad,* 5 Allen, 221. There is nothing in that decision which gives support to this ruling of the auditor. *Fall River Iron Works Co.* v. *Old Colony & Fall River Railroad* was a case where by statute the defendant railroad company had been given authority to construct and maintain a railroad from a point at or near its terminus in Fall River in a southerly direction to connect with a railroad to be constructed from Newport in the State of Rhode Island. Acting under that authority it filed a location which left its tracks twenty-four hundred seventy-five feet short of its terminus in Fall River. This location crossed the plaintiff's land. Deeming itself injured, the plaintiff brought a bill to enjoin the defendant from building under that location. The case was reserved for the consideration of the full court. In refusing to restrain the defendants this court said, at page 226, that from the terms of the act it was left to the railroad corporation or its agents to fix the point of departure and consequently that it was intended "to vest in them the exercise of the needful judgment and discretion to carry into effect the authority which they [the Legislature] intended to grant. It follows, that unless the defendants have clearly exceeded the limits of this discretion, and have acted either in bad faith or in disregard of the just limits which by a reasonable construction of the words of the statute should be put on their power to fix the *terminus a quo,* they cannot be deemed to have invaded the plaintiffs' rights."

In the first place the auditor's ruling changed the rule there

laid down by transposing the word "clearly" to a new connection. It is one thing to say that "unless the defendants have clearly exceeded the limits of their discretion," and it is quite another thing to say "unless it clearly appears that they have exceeded the limits of their discretion." It is one thing to make out by a fair preponderance of the evidence that the defendant clearly exceeded the limits of the discretion vested in it; it is another thing to put on the party who has the burden of proof the burden of proving that it exceeded the limits of discretion by a "stricter standard than is described by the word 'preponderance.'"

But this is not the main difference between the auditor's ruling and this statement in the opinion in *Fall River Iron Works Co.* v. *Old Colony & Fall River Railroad.* In that case the plaintiff was attacking the action which the railroad corporation had taken in the exercise of the discretion granted to it by the Legislature. In such a case the burden of proving that the defendant railroad company had not exercised that discretion in good faith was upon the plaintiff. It is hard for a plaintiff to make out a negative. Having that in mind, this court stated the proposition which the plaintiff had to make out in terms of an abuse of discretion. The abuse of discretion and the failure to exercise a discretion in good faith are statements of the same proposition. In the case at bar the burden was on the Albany. The burden was on the Albany because it came into court asking to have the New Haven, the Commonwealth and the city of Worcester pay their respective shares of the cost of the work which was done by it under the decree eliminating the grade crossings in question. The burden on the Albany was to show that in exercising the discretion committed to it it had acted in good faith. If it had acted in good faith the conclusion arrived at by it could not be revised by any person or by any body. It follows that the exception (being the twelfth) based on this ruling of the auditor must be sustained.

3. It appeared that the Albany used crushed stone instead of gravel for ballasting the surface of the bridge. Crushed stone costs $1.29, while gravel costs sixty-four and five tenths cents per cubic yard. On this point the provision of the decision of the commissioners is in these words: "The main tracks of the Boston and Albany railroad are to be reconstructed with suitable rails, ties and ballast." The Commonwealth requested the auditor to

find that "as a matter of law, the Boston and Albany were entitled to be reimbursed only to the extent of the cost of the installation of a good gravel ballast." In place of doing so the auditor made this finding: "(a) Broken stone was a 'suitable' ballast and one that it was proper to use in relaying and reconstructing the tracks of the railroad company on the lines and grades prescribed by the decision and decree, (b) such stone was the most suitable ballast to use upon the high embankment upon which it was used. Gravel would to some extent probably have blown off at the elevation at which it must have been placed. The stone distributed the 'load' better than gravel, and in dry weather gravel would not keep packed to the ties and would shake off with the frequent traffic, thus affecting the surfacing of the track. . . . (d) The use of broken stone as ballast in connection with the relaying and reconstructing of the tracks of the railroad company at the new grade was reasonably necessary for and incidental to the carrying out of the terms of the decree in the circumstances under which it was laid." We cannot say that this finding of the auditor is not correct. The evidence on which it was made is not before us. If it was correct the ruling asked for by the Commonwealth was wrong. We find nothing in *Mayor & Aldermen of Newton, petitioners,* 172 Mass. 5, 7, or in *Selectmen of Norwood, petitioners,* 183 Mass. 147, 150, which supports the Commonwealth's contention in this connection.

4. The Commonwealth also objects to the allowance by the auditor of $467 paid by the Albany to move the poles and wires of the Western Union Telegraph Company from the old location. It appeared that these poles and wires had been erected under an agreement "under which the telegraph company agreed to change from time to time the location of its poles and wires on the Boston and Albany location, the railroad company to furnish the unskilled labor required for making such changes." The auditor found that when the time came for moving the poles and wires the railroad company did not have the unskilled labor necessary to make the changes and thereupon the telegraph company employed outside labor to do the work and paid therefor the sum of $467 which the railroad repaid to the telegraph company. It is plain that the work of moving the poles and wires was an incident of the work which the commissioners' decision

directed the Albany to do. It follows that it was a part of the work to be done by it in carrying out the scheme adopted by the report of the commission within the rule laid down in *Mayor & Aldermen of Newton, petitioners,* 172 Mass. 5, 9, and *Selectmen of Norwood, petitioners,* 183 Mass. 147, 148, relied upon in this connection by the Commonwealth itself.

It follows that the twelfth exception taken to the auditor's report by the New Haven and by the Commonwealth must be sustained and the case recommitted to the auditor for reconsideration (without the introduction of further evidence) of his finding as to the cost of the Green Street bridge under the rule of law here laid down. To that extent the order overruling all exceptions taken to it and confirming the auditor's report is reversed. So far as the other exceptions to the auditor's report are concerned that order is confirmed.

*So ordered.*