## Richmond.

SOUTHERN RAILWAY CO. V. COMMONWEALTH.

November 14, 1918.

Absent, Sims, J.

1.  STATE CORPORATION COMMISSION—*Powers — Railroads — Streets and Highways.*—The powers of the State Corporation Commission over railroads operating in this State are very great, but it has no powers, as a rule, over the public roads of the State. The boards of supervisors of the counties and other road authorities have "the control, supervision, management and jurisdiction" over all the county roads, but, as a rule, have no powers or jurisdiction over the railroads operated in this State.

2.  CROSSINGS—*Jurisdiction of State Corporation Commission.*—The duty imposed upon a railroad company by section 1294-b, clause 3, Code of 1904, which provides that when a county road is altered at a crossing, the railroad shall make an equally convenient road in lieu thereof, is a public duty imposed by law, and a breach of this duty is within the purview of section 1313-a, clauses 16 and 17, by which the commission is given power to require a railroad company to perform and discharge any public duty or requirement imposed by law, and is charged with the duty of making inquiry and examination for the purpose of ascertaining whether anything has been done or omitted in violation or contravention of the law.

3.  CROSSINGS—*Jurisdiction of State Corporation Commission.*—Railroad companies owe duties to the public traveling on the highways of the State as well as to passengers on its trains, and these duties are manifestly public duties, and the commission has power and authority to require their performance. A breach of these duties is a violation of law. If no consent of the board of supervisors had been obtained, and no "equally convenient" road built, and the railroad company had placed a fill across a public highway, this would have been a plain violation of law (Code, section 1294-b, clause 3),

and a failure to perform a public duty, and the commission would have had power and jurisdiction to administer relief. Whether or not such consent was given, or such road was built are questions of fact to be ascertained upon investigation, which affect the order to be made in the cause, but do not affect the jurisdiction of the commission, which is charged with the duty of *inquiring* and ascertaining whether or not the law has been violated, and, if a public duty has been neglected, of enforcing its performance.

4.  STATE CORPORATION COMMISSION — *Duties — Crossings — Grade Crossings.*—Under sections 156-a and 156-b of the Constitution of 1902, and section 1313-a, clauses 16, 17, 20 and 21, and section 1294-b, clauses 3 and 19, Code 1904, it is the duty of the Corporation Commission to see that travelers upon the highways of the Commonwealth are not exposed to unnecessary dangers or unduly impeded in the use of such highways by the operation of railroads, and to that end it has jurisdiction to make all needful inquiries, and when in its judgment it is proper, it may require railway companies to eliminate grade-crossings of the public highways. The danger at such crossings is not confined to travelers or property upon the public highways, but extends also to persons and property transported on the railroads, and it cannot be doubted that the commission has jurisdiction for the protection of the latter.

5.  CROSSINGS—*Grade Crossings—Policy of the State—New Construction.*—The policy of the State is declared by section 1294-d, clause 38, Code of 1904, to be to eliminate grade crossings wherever it is reasonably practical and may be done without unreasonable expense. In the instant case, not only was the road double-tracked, but an embankment upwards of ten feet high was thrown across the public highway. This is within the spirit, if not the very letter, of the statute above cited, applying to "every railroad hereafter constructed." The Supreme Court of Appeals, however, said that it did not wish to restrict the jurisdiction of the commission, under section 1924-d, clause 38, Code of 1904, in regard to grade crossings, to cases of new construction.

6.  CROSSINGS—*Grade Crossings—Duty of Railroad Company.*—Whether it is the duty of a railroad company to build an undergrade crossing of a type to be prescribed by the State Corporation Commission, when the railroad is double-tracking its line and altering its grade at a highway crossing, depends upon the circumstances of the particular case. It is

the duty of the company to build a road equally as convenient as the old road (section 1294-b, clause 3, Code of 1904), and if this can be done only by building an underpass of a particular type, it must be built of that type, and whether or not it is "an equally convenient" road is a fact to be determined by the tribunal having jurisdiction of the same.

7. STATE CORPORATION COMMISSION—*Grade Crossing—Power of the Commission—Appeal.*—An objection that "if the commission has power to compel the separation of grades, it is within its power to require the expenditure of millions of dollars by the railroads of this State," is untenable. If the safety of travel and the rights of the public demand such expenditure, it should be made, and the Supreme Court of Appeals will not presume that the State Corporation Commission will act from prejudice, or render an unjust or unfair decision against the railroad companies, but, on the contrary, will follow the mandate of the Constitution, "that the action of the commission appealed from shall be regarded as *prima facie* just, reasonable and correct."

8. ABATEMENT, REVIVAL AND SURVIVAL—*Another Suit Pending.*—The Jurisdiction of the State Corporation Commission in regard to the obstruction of a highway by a railroad at a crossing and the establishment of an undergrade crossing is not affected by the pendency of an injunction suit of the board of supervisors of the county against the railroad company when the proceeding was instituted before the Corporation Commission, where the parties to the two proceedings were not the same, nor were the objects to be accomplished identical. Especially is this true where the injunction suit has been dismissed, as the Supreme Court of Appeals will not turn the parties out of court and send them back to institute identical proceedings in the same court, between the same parties, to try the same issues, upon identical evidence, simply because the injunction suit was pending when this proceeding was instituted.

9. CROSSINGS—*Consent of Board of Supervisors—Whether a Contract.*—In the instant case it is held that the evidence did not sustain the contention that the consent of the board of supervisors to the alteration of a county road at a railroad crossing was obtained by misrepresentation of the situation at the crossing by the representatives of the railroad company, or by failure of such representatives to disclose facts that should have been disclosed, the chairman of the board having in his

testimony expressly stated that he did not believe that the railroad representatives intended to mislead the supervisors.

10. CROSSINGS—*Alteration of County Road—Consent of Supervisors Alone—Consent of State Highway Commissioner.*—Where the establishment of an underpass at a crossing involved a change in the county road, the supervisors, acting alone, had power to consent thereto under section 1294-b, clause 3, Code of 1904, and it was not necessary also to obtain the consent of the State Highway Commissioner, notwithstanding section 944-a of the Code of 1904, as amended by Acts 1916, p. 495, and the statutes relating to closing roads and opening new roads. These statutes, like all others, must be construed along with other statutes *in pari materia*, and the whole rendered harmonious, if possible. The statutes relied on are general in their nature, and do not refer specifically to the minor changes made necessary in effecting a railroad crossing.

11. STATUTES—*Construction—General and Specific Statutes.*—A statute applicable to a special or particular state of facts must be treated as an exception to a general statute so comprehensive in its language as to cover all cases within the purview of the language used. In this way, and no other, can the two statutes be harmonized.

12. CROSSINGS—*Alterations of County Road—Consent of Supervisors.*—Under section 1294-b, clause 3, Code of 1904, in order to acquire the right to cross a county road, it is necessary not only to obtain the consent of the board of supervisors, but the works of the railroad company are also to be "so located and constructed and operated as not to impair, impede or obstruct in any material degree" the county road, and the new road is to be "an equally convenient road." The board has no power to consent, except within the limits prescribed by the statute. No consent by it could authorize a crossing in contravention of the statute. Its consent alone is not sufficient to warrant the change and does not constitute an irrevocable contract between the county and the railroad company.

13. STREETS AND HIGHWAYS—*Jurisdiction of Board of Supervisors—Police Power.*—The jurisdiction of the board of supervisors over the public highways of the State is part of the police power of the State delegated to the board by the legislature which the board cannot barter away. The police power of the State is a governmental function, the exercise of which neither the legislature, nor any subordinate agency thereof, upon which part of its authority may have been conferred, can alienate or surrender by grant, contract or other delegation.

14. CROSSINGS—*Consent of Supervisors—Estoppel—Impairment of Obligation of Contracts.*—A railroad company, like an individual, is chargeable with knowledge of the law, and if, in reliance upon the resolution of a board of supervisors consenting to the alteration of a county road and the construction of an underpass at a crossing, it expends money in obtaining ground to build approaches to the underpass, such reliance cannot and does not bar the rights of the public, nor relieve the company of the obligation placed upon it by the statute, to build "en equally convenient road," and one that does not in any material degree impair, impede or obstruct travel on the county road. The duty to build such a road was a prerequisite to the right to disturb the existing crossing, and is a continuing duty. The statute gave the public the right to demand such a crossing, and the board of supervisors could not take it away. Whether or not such a crossing was provided for is a question of fact to be determined by the evidence. The resolution of the board consenting to the underpass and alteration of the road, though accepted and acted on by the railroad company, did not constitute such a contract as is protected by the Constitution, State or Federal.

15. CROSSINGS—*Grade Crossings—Power of State Corporation Commission—Expense of Crossing.*—While the State Corporation Commission has jurisdiction to compel railroads to separate the grades of their tracks from the grades of the public highways, and to make the grades of their tracks above or below the grades of such highways, and where the change is at the instance and for the benefit of the railroad company, to require the railroad company to pay the entire expense, as a rule existing crossings should be left undisturbed unless the change is effected under the provisions of section 1294-d, clause 39, of the Code of 1904. That section clearly indicates that, as to existing grade crossings of county roads by railroads, when the local authorities desire to improve the county roads by separating the grades, they may require the railroad authorities to make the necessary change only upon the condition that the expense thereof be equally borne by the county and the railroad company. The jurisdiction of the commission to compel a separation of grades at existing crossings at the expense of railroad companies should only be exercised in exceptional cases, where the proof is clear and satisfactory that

a duty rests upon the railroad company to make it, in consequence of some peculiar danger to the traveling public.

16.  CROSSINGS—*Grade Crossings—Power of State Corporation Commission—Expense of Change.*—All grade crossings are, more or less, inconvenient and dangerous, but mere inconvenience or necessary dangers usually incident to such crossings will not justify the exercise by the commission of jurisdiction to compel a separation of grades at the expense of the railroad companies.  The continuation of existing grades should be the rule, the change of grade at the expense of the railroad company the exception, and this exception should not be made except for cogent reasons.

17.  JUDICIAL NOTICE—*War—Cost of Railroad Construction.*—In view of the great European war, in which the United States is a participant, and the consequent difficulty of getting materials of all kinds for railroad construction, of which the Supreme Court of Appeals will take judicial notice.

*Held:* That the time allowed the railroad company in the instant case to construct the underpass was too short, and that the company should be required to install such underpass as soon as practicable, with leave to the board of supervisors, or any person interested, to apply to the commission for any further order that may be necessary to insure the prompt construction of such underpass.

Appeal from the State Corporation Commission.

*Reversed.*

The opinion states the case.

*Geo. E. Walker* and *R. B. Tunstall,* for the appellant.

*Jno. R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *F. B. Richardson,* for the Commonwealth.

*R. T. W. Duke,* Jr., for the board of supervisors of Albemarle county.

BURKS, J., delivered the opinion of the court.

In double tracking its line through Albemarle county in 1916, the Southern Railway Company found it necessary or desirable to change its grades at many points. At North Garden, in said county, there was a considerable dip which the company proposed to take out by making a fill. At this point the public highway crossed the railroad at grade diagonally at an angle of twenty-two degrees, and it was necessary for the company to make an underpass for the highway. The construction of the double track was rapidly approaching this crossing before any arrangement had been made with the board of supervisors of the county with reference to the character of the crossing to be put in. Early in October, 1916, the claim agent of the company went to Albemarle county for the purpose of arranging about the crossing with the supervisors. A crossing at right angles to the railroad was very much less expensive than one at twenty-two degrees, and the company was therefore anxious to put in the right angle crossing if it could be arranged. In order to accomplish this result, however, it was necessary to change the location of the highway for a short distance on each side of the railroad. A pencil sketch of the proposed change in the highway and of the crossing was prepared, and was shown to the local member of the board of supervisors, and to the chairman of the board, and it is claimed was explained to them. This sketch, though drawn to scale, does not show on its face that it was so drawn. The claim agent seems to have satisfied these two members of the board that the crossing would be suitable and convenient, and he urged a meeting of the board of supervisors as early as possible to adopt the crossing as proposed. The chairman of the board of supervisors thereupon called a special meeting of the board, to be held for that purpose on the next day, to-wit: October 6, 1916, and the meeting was accordingly held. The agents of the company appeared before the board, with

the pencil sketch aforesaid, and explained the same, and asked for the adoption of the proposed underpass and the incidental changes in the highway approaches thereto. The board, thereupon, on October 6, 1916, adopted the following resolution:

"This day appeared before this board the authorities of the Southern Railway Company and asked to be permitted to make changes in the county road leading from North Garden to Covesville, so as to establish the underpass at North Garden depot, as shown by the diagram exhibited, and the board being satisfied that such changes are wise, it is ordered that they may be made entirely at the cost of the Southern Railway Company, and it appearing that in order to make such changes the present crossing of the Southern Railway Company will have to be closed, it is ordered that the said company shall provide at its cost a suitable and convenient temporary pass until said underpass can be established. It being distinctly understood that in making said underpass all changes in the road leading thereto and therefrom shall be of the easiest possible grade not exceeding five per cent. at any point, and shall be well drained and all the water to be taken care of and carried off from said road and underpass. And it is further ordered that said company shall furnish to this board a blue-print of the proposed underpass and changes in road in accordance with said diagram."

After the adoption of this resolution the company purchased the land needed for the proposed change in the highway approaches, at a cost of $1,300. The company began work on the fill to take out the dip on October 7, 1916, and by the evening of October 17, 1916, had brought it, at varying heights, up to the public highway. A few days after October 6, 1916, complaints were made to the chairman of the board about the proposed change, and the representative of the company was notified thereof probably about

the 10th or 12th of October. The chairman testifies that he told Mr. Peyton, the representative of the company, "I thought we had better go up there and see the situation; that there was a great deal of complaint; that we could not close this grade crossing, but that there would be a considerable stir there, and we had better have a meeting there and have the people discuss the matter. Mr. Peyton threw it aside and took no notice of it whatever." This statement was made "some little time before the meeting of revocation, some little time before that." On October 18, 1916, the regular meeting of the board was held, and the following resolution was adopted:

"The Southern Railway Company having at this meeting furnished to this board a blue-print of the proposed underpass and changes in the road at North Garden in this county, and the board having carefully considered said blue-print and the statements of citizens in the neighborhood of North Garden, and being satisfied that to change the public road and construct the said underpass as laid down in said blue-print and in accordance with the resolution at the special meeting of this board on October 6, 1916, will render the highway less safe and convenient for the passage and transportation of persons and property under and over the same, and that the use of the said highway by the public will be materially and unnecessarily interfered with by the construction of the proposed underpass and changes, as in said resolution and diagram set out, doth revoke the said resolution passed at the special meeting of this board on October 6, 1916, and doth declare the same null and void and of no effect."

Mr. Peyton, claim agent and representative of the company in this matter, was notified of the meeting several days before it was held, and both he and Mr. Abernathy, the company's engineer, were present at the meeting. A copy of this resolution was mailed to the representative of

the company on October 18 or 19, and he says he received it on the 21st. He admits, however, that he had heard rumors that it changed (but he did not know how) the resolution of October 6.

The railroad company having previously made a temporary passway over its tracks, and regarding the rescinding resolution as invalid and ineffectual, continued the prosecution of its work, thereby completely obstructing the highway, until it was stopped by an injunction from the Circuit Court of Albemarle county on November 16, 1916. On that day the board of supervisors of Albemarle county filed their bill asking for an injunction against the further prosecution of the work, which injunction was awarded and made effective for sixty days. On the 22nd day of December, 1916, the railway company moved to dissolve the injunction, filing its answer and the affidavits of Messrs. A. N. Peyton and D. S. Abernathy, and the board of supervisors filed its counter affidavits, and the matter came on to be heard upon the motion to dissolve the injunction. This motion the court overruled by its decree entered January 4, 1917, whereby the injunction order was enlarged for a period of ninety days from January 16, 1917. On the 10th of January, 1917, a petition for an appeal was presented to this court and allowed, and the case was thereafter argued, but this court, at its Wytheville term, in June, 1917, dismissed the said appeal without prejudice to either party, and remanded the cause to the circuit court for further proceedings. On July 16, 1917, the judge of the Circuit Court of Albemarle county entered an order dismissing the proceedings in the circuit court.

On January 12, 1917, it having been suggested to the State Corporation Commission that the Southern Railway Company had obstructed the highway at North Garden, in Albemarle county, by constructing across the grade crossing at that point a long fill or embankment from 10 to 17

feet in height, without having made provision for any crossing at that point, the commission issued a rule against the company requiring it to show cause, if any it could, "why it should not be ordered to establish and maintain such an underpass at the point where its said road crosses the old Scottsville turnpike at North Garden, Albemarle county, Va., as may be reasonable and just." The company answered at length and in detail, setting out all previous proceedings had in relation to said crossings, and, amongst other defenses, denied the jurisdiction of the State Corporation Commission in the premises. The commission overruled the objection to its jurisdiction, and heard the case on its merits. The result of the hearing on the merits was an order by the commission, requiring the Southern Railway Company, within the time specified in the order, to "cause to be removed the obstruction to the use of the public road" at the crossing aforesaid, and "to put in a permanent structure for an underpass along the old established road * * * with a perpendicular clearance of thirteen and one-half feet." From that order this appeal of right was taken to this court.

The powers of the State Corporation Commission with respect to compelling railroads to separate the grades of their tracks from the grades of the public highways, and to make the grades of their tracks above or below the grades of such highways, have not heretofore been passed upon by this court, but jurisdiction in such matters has been twice asserted and maintained by the commission. *Commonwealth* v. *Southern Ry. Co.*, State Corp. Com. Rep. 1913, p. 51; *Commonwealth* v. *Chesapeake & Ohio Ry. Co.*, State Corp. Com. Rep. 1916, p. 5.

[1] The powers of the State Corporation Commission over railroads operating in this State are very great, but it has no powers, as a rule, over the public roads of the State. The boards of supervisors of the counties and other road

authorities have "the control, supervision, management and jurisdiction" over all the county roads, but, as a rule, have no powers or jurisdiction over the railroads operated in this State. When and so far as the two come in contact, when the railroad and the county road cross each other at grade, and it is deemed proper that the grades of an existing crossing should be separated, and the parties cannot agree as to the character of the crossing to be made and the costs thereof, and it is sought to impose the entire costs thereof upon the railroad company, thereby excluding the operation of section 1294-d, clause 39, has the State Corporation Commission jurisdiction to determine the character of the crossing to be made and who shall bear the costs thereof?

The State Corporation Commission maintains its jurisdiction, in the instant case, in the following language:

"The power of this commission has been invoked to require the railway company to restore the said Scottsville turnpike to the use of the public by putting in an underpass. The railway company challenges the jurisdiction of this commission.

"Section 1294-d, clause 38, Code of 1904, declares the policy of the State in favor of an underpass to carry the public road, rather than a grade crossing, and provides:

" 'Every railroad hereafter constructed across a county road * * * shall wherever it is reasonably practicable, and does not involve an unreasonable expense, all the circumstances of the case considered, pass above or beneath the existing structure at a sufficient elevation or depression, as the case may be, with easy grades, so as to admit of safe and speedy travel over each.'

"1294-b, clause 3, provides: 'If any railroad deems it necessary in the construction of its work to cross any other railroad * * * or any county road, it may do so; provided such crossing shall be so located and constructed and

operated as not to impair, impede or obstruct in any material degree the works and operations of the railroad, canal, turnpike or other works to be crossed; and, provided, such crossing shall be supported by such permanent and proper structures and fixtures and shall be controlled by such customary and approved appliances, methods and regulations as will best secure the safe passage and transportation of persons and property along such crossing.'

"That the Southern Railway has violated the law by the obstruction and closing of the public road at North Garden cannot be questioned. Has the commission power and is it its duty to require the Southern Railway Company to perform its duty and comply with the law?

"This commission is charged with the duty of visitation, supervision, regulation and control of public service corporations. (Constitution, section 156-a.)

"Section 1313-a, clause 17, Pollard's Code, provides: 'It shall be the duty of the commission to make inquiry and examination from time to time into the acts and proceedings of railroad or other transportation companies, for the purpose of ascertaining whether anything has been done or omitted in violation or contravention of their charters, or of the law.'

"As above stated, section 1294-b, clause 3, Pollard's Code, prescribes the terms on which a railroad may cross a county road, and clause 19 of the same section reads:

"'Any person aggrieved by anything done or omitted in violation of the provisions of this act, by any public service corporation chartered or doing business in this State, shall have the right to make complaint of the grievance and seek relief by petition against such public service corporation before the State Corporation Commission, sitting as a court of record. If the grievance complained of be established, the State Corporation Commission, sitting as a court of record, shall also have jurisdiction, by injunc-

tion, to restrain such public service corporation from continuing the same, * * * shall also have jurisdiction, by mandamus, to compel any public service corporation to observe and perform any public duty imposed upon public service corporations by the laws of this Commonwealth.'

· "Complaint has been made to this commission of the closing and obstructing of the public road at North Garden. The fact that said public road has been closed by the act of the Southern Railway is established beyond a question. That this is a violation of the law there can be no doubt. The jurisdiction of the commission in the premises is complete. Therefore, the plea to the jurisdiction is overruled."

There is another statute not quoted or referred to by the commission (section 1313-a, clause 16), which also has an important bearing on the question at issue. It is the statute defining the powers of the commission, and is as follows:

"The commission shall have power and authority to require, by its rules, regulations and requirements, all corporations chartered under the laws of this State, and all foreign corporations doing business in this State, to perform and discharge any public duty or requirement imposed upon such corporations by the constitution, or by law, and may require all such corporations to furnish such reports to the commission as may be provided by the Constitution, or by law, and the commission may enforce against any such corporation, by its judgment and processes, any fine or other penalty imposed by law for the failure of any such corporation to perform any public duty required of it, or to comply with any requirement of law, or any lawful regulation of the commission in reference to the same. The commission may require the establishment by transportation companies of separate waiting rooms at all stations, wharves, or landings for the white and colored races."

7

The road to be crossed was a county road, not techni-cally a State road, but as said in *Charlottesville* v. *South-ern R. Co.,* 97 Va. 428, 34 S. E. 98, "the highways of this State, whether under the control of the county or State, are the property of the State, held in charge for the benefit of the public, and the rights of the public require the railroad companies to place and keep crossings in such condition as the statute requires, and this is not affected by anything the State or county does or fails to do."

[2, 3] Section 1294-b, cl. 3, amongst other things, provides: "* * * any county road, * * * may be altered by any such company for the purposes aforesaid whenever it shall have made an equally convenient road * * * in lieu thereof, the said company having first obtained the consent of the board of supervisors of the county to the alteration of any road or highway." It cannot be doubted, therefore, that the duty imposed upon the railroad company to provide an "equally convenient" road was a *public* duty imposed by law. A breach of this duty is within the purview of sec-tion 1313-a, clauses 16, 17. By the very terms of section 1313-a, clause 16, the commission is given power and au-thority to require the railroad company "to perform and discharge any public duty or requirement imposed upon such corporation by the Constitution, or by law," and by clause 17 of the same section, the commission is charged with the duty of making inquiry and examination "for the purpose of ascertaining whether anything has been done or omitted in violation or contravention * * * of the law." These statutes are not restricted to duties owing to persons traveling on the railroad, but extend to all public duties. Railroad companies owe duties to the public traveling on the highways of the State as well as to passengers on its trains, and these duties are manifestly public duties, and the commission has power and authority to require their performance. A breach of these duties is a violation of

law. If no consent of the board of supervisors had been obtained, and no "equally convenient" road built, and the railroad company had placed a fill across a public highway, this would have been a plain violation of law (Code, section 1294-b, clause 3), and a failure to perform a public duty, and we do not doubt that the commission would have had power and jurisdiction to administer relief. Whether or not such consent was given, or such road was built, are questions of fact to be ascertained upon investigation, which affect the order to be made in the cause, but do not affect the jurisdiction of the commission, which is charged with the duty of *inquiring* and ascertaining whether or not the law has been violated, and, if a public duty has been neglected, of enforcing its performance.

[4] Section 156-a of the Constitution, designates the State Corporation Commission as the department of the government for the visitation, supervision, regulation and control of corporations. Section 156-b of the Constitution clothes the commission with the power and charges it with the duty to supervise and regulate transportation companies in all matters relating to the performance of their duties. Section 1313-a, clause 16, of the Code, invests the commission with power and authority to require all corporations doing business in this State to discharge and perform any public duty imposed upon such corporation by law. Section 1313-a, clause 17, imposes upon the commision the duty of making inquiry and examination for the purpose of ascertaining whether railroad or transportation companies have done or omitted to do anything in violation of law. Section 1294-b, clause 19, declares that any person aggrieved by the omission of a public service corporation to fulfill its duty shall have the right to complain thereof to the commission, and, if the complaint is established, the commission is authorized to grant relief. Other sections of the Code, for example Section 1313-a, clauses 20

and 21, manifest an intention on the part of the legislature to give to the commission supervision of and control over the operations of transportation companies. County roads are public highways, and, as such, the property of the State. Section 1294-b, clause 3, shows that the State is particular to safeguard the public traveling on such highways at railroad crossings, and it cannot be doubted that the duty imposed upon railroad companies at such crossings is a public duty. Under the constitutional and statutory authorities cited, it is the duty of the Corporation Commission to see that travelers upon the highways of the Commonwealth are not exposed to unnecessary dangers or unduly impeded in the use of such highways by the operation of railroads, and to that end it has jurisdiction to make all needful inquiries, and when in its judgment it is proper, it may require railway companies to eliminate grade crossings of the public highways. The danger at such crossings is not confined to travelers or property upon the public highways, but extends also to persons and property transported on the railroads and it cannot be doubted that the commission has jurisdiction for the protection of the latter. Code, section 1313-a, cl. 20.

[5] As to new construction, the policy of the State is declared by section 1294-d, clause 38, to be to eliminate grade crossings wherever it is reasonably practical and may be done without unreasonable expense. In the instant case, not only was the road double tracked, but an embankment upwards of ten feet high was thrown across the public highway. This is within the spirit, if not the very letter of the statute above cited, applying to "Every railroad hereafter constructed." But we do not wish to restrict the jurisdiction of the commission to cases of new construction.

[6] It is insisted by counsel for the railroad company that it is not a public duty of a railroad company to build an undergrade crossing of a type to be prescribed by the commis-

sion. This depends upon the circumstances of the particular case. It is the duty of the company to build a road equally as convenient as the old road, and if this can be done only by building an underpasss of a particular type, it must be built of that type, and whether or not it is "an equally convenient" road is a fact to be determined by the tribunal having jurisdiction of the same.

[7] It is further stated by counsel for the railroad company that "if the commission has power to compel the separation of grades, it is within its power to require the expenditure of millions of dollars by the railroads of this State." If the safety of travel and the rights of the public demand such expenditure, it should be made, and this court will not presume that the State Corporation Commission will act from prejudice, or render an unjust or unfair decision against the railroad companies, but, on the contrary, will follow the mandate of the Constitution, "that the action of the commission appealed from shall be regarded as *prima facie* just, reasonable and correct."

[8] A further objection is raised to the jurisdiction of the commission, because of the pendency of the injunction suit of the board of supervisors against the railroad company when this proceeding was instituted. The parties to the two proceedings were not the same, nor were the objects to be accomplished identical. But even if they were, the objection is no longer a practical one. The injunction suit has been dismissed, and this court will not now turn the parties out of court and send them back to institute identical proceedings in the same court, between the same parties, to try the same issues, upon identical evidence, simply because the injunction suit was pending when this proceeding was instituted. Any further litigation of the questions here involved is both undesirable and unnecessary.

[9] The next question for consideration is, did the consent of the board of supervisors to the perpendicular underpass

create a binding contract between the supervisors and the railroad company? This question has been argued from several points of view. It has been insisted that the consent was obtained by misrepresentation of the situation at the crossing by the representatives of the railroad company, or by failure to disclose facts which should have been disclosed, and that in consequence thereof the supervisors did not understand the situation, and, therefore, their consent was not valid. This contention, in our opinion, is not sustained by the evidence, and need not be further considered. The chairman of the board, one of the strongest witnesses in its behalf, in speaking of Mr. Abernathy, the representative of the railroad company, said more than once, "I do not want to be understood here to create the impression that I believe that Mr. Abernathy designed to mislead me there, for my dealings with him have been such in all these matters that I am satisfied he would not intentionally misrepresent any matter."

[10] It is further argued that the establishment of the underpass involved a change in the county road, and that the supervisors had no power to consent thereto, acting alone, but that it was necessary also to obtain the consent of the State Highway Commissioner. For this proposition reliance is placed on section 944-a of the Code, as amended by Acts 1916, p. 495, and on the statutes relating to closing roads and opening new roads. But these statutes, like all others, must be construed along with other statutes *in pari materia*, and the whole rendered harmonious, if possible. The statutes relied on are general in their nature, and do not refer specifically to the minor changes made necessary in effecting a railroad crossing.

Section 944-a, clause 1, of the Code, as amended in 1916, is as follows:

"The boards of supervisors, county superintendents of roads, road sub-district boards, road sub-district surveyors

of their respective counties and the State Highway Commissioner shall have the control, supervision, management, and jurisdiction as is or may be hereafter provided by law, over all of the county roads." Acts 1916, p. 495.

It will be observed that the *joint* control and jurisdiction over the county roads given by the statute is such as is, or may be hereafter, provided by law. The statute does not require *joint* action where separate action has heretofore been, or may hereafter be, provided by law by another statute which is still in operation.

Section 1294-b, clause 3, relating to railroad crossings, provides that "any county road * * * may be altered by any such company for the purposes aforesaid whenever it shall have made an equally convenient road * * * in lieu thereof, the said company having first obtained the consent of the board of supervisors of the county to the alteration of any road or highway." Reading the last two statutes together, it would seem that the consent of the board of supervisors alone is the only consent required to enable the railroad company to make the desired alteration. The requirement that the board of supervisors should consent to the change was made for the first time by Acts 1902-3-4, p. 968. Prior to that time no consent of the county or the road authorities was required. The proceeding on the part of the railroad company was wholly *ex parte*, and it had the right to make the change, "whenever it shall have made an equally convenient road" in lieu of the old road. The history of the legislation on this subject is very fully set out by Judge Sims in *Supervisors* v. *Norfolk & Western R. Co.*, 119 Va. 763, 91 S. E. 124, and need not be here repeated. Doubtless the legislature regarded the consent of the board of supervisors as ample to safeguard the public interest.

Section 1294-b, clause 3, deals largely with the crossing of the right of way of one public service corporation by

the works of another, which is always a matter of serious import, and the language quoted from the end of that section relating to the crossing of a county road by a railroad would seem to be a plain indication that the legislature intended to prescribe a simple mode of procedure for such crossing, and at the same time to safeguard the public interest. This view of the interpretation of the section is strengthened by the fact that from the earliest date of railroad construction in the State until 1904 no restraint was put upon railroad companies in making such changes, except that they must make another "equally convenient" road. No consent of any one was required. Whether the new road was "equally convenient" was always a question to be determined by the courts if the parties themselves could not agree.

[11] The statutes relating to opening and closing of roads do not apply to a case of this kind. They are general in their nature and intended to apply to cases not otherwise specially provided for. A statute applicable to a special or particular state of facts must be treated as an exception to a general statute so comprehensive in its language as to cover all cases within the purview of the language used. In this way, and no other, can the two statutes be harmonized.

It is true that by section 834, clause 6, of the Code, the board of supervisors are authorized "to represent the county, and have the care of the county property and the management of the business and concerns of the county, in all cases where no other provision shall be made," but in this case the function of the board of supervisors is specifically set forth in section 1294-b, clause 3, of the Code, and it is expressly claimed by the railroad company that the supervisors acted under the latter section. In pursuance of that section the railroad company did "first obtain the consent of the board of supervisors of the county to the alteration,"

but that alone was not sufficient to warrant the change, nor did it constitute an irrevocable contract between the county and the railroad company. It did not constitute a contract for several reasons.

The consent of the board of supervisors was only one of several prerequisites to the right to make the crossing. Section 1294-b, clause 3, declares:

"If any railroad deems it necessary in the construction of its work to cross any other railroad * * * or any county road, it may do so; provided such crossing shall be so located and constructed and operated as not to impair, impede or obstruct in any material degree the works and operations of the railroad, canal, turnpike or other works to be crossed."

It is conceded that the term "other works" is broad enough to cover a county road. The closing paragraph of the same section declares:

"But any county road may be altered by any such company for the purposes aforesaid whenever it shall have made an equally convenient road in lieu thereof, the said company having first obtained the consent of the board of supervisors of the county to the alteration of any road or highway."

[12] So that, in order to acquire the right to cross the county road, it was necessary not only to obtain the consent of the board of supervisors, but the works of the railroad company were also to be "so located and constructed and operated as not to impair, impede or obstruct in any material degree" the county road, and the new road was to be "an equally convenient road." Nor did the board have the power to consent, except within the limits prescribed by the statute. It could not consent to a crossing that would "impair, impede or obstruct in any material degree" the travel upon the public highway. If it did, its consent would be unavailing, for the language of the statute is explicit

8

that the crossing can only be made *provided* it does not "impair, impede or obstruct in any material degree" the county road to be crossed. Whether or not the underpass would impair, impede or obstruct the county road, was a question of fact of which the board of supervisors were not the sole judges. If no one made objection to it, of course, it would stand, but the public is interested in the highways of the State, and as said by Buchanan, J., in *Charlottesville* v. *Southern R. Co., supra,* "the rights of the public require the railroad companies to place and keep the crossings in such condition as the statute requires, and this is not affected by anything the State or county does or fails to do." No consent, therefore, of the supervisors could authorize a crossing in contravention of this provision of the statute. If given, it could not affect the rights of the public to such a highway as the statute required. Furthermore, the new road must be "an equally convenient" road, and the supervisors have no power to consent to anything less.

[13] If the board has in fact consented to a crossing that impairs, impedes or obstructs the travel on the county road, or is not "an equally convenient road", it is not bound by such consent. The jurisdiction of the board of supervisors over the public highways of the State is a part of the police power of the State delegated to the board by the legislature which the board cannot barter away. "The police power of the State is a governmental function, the exercise of which neither the legislature, nor any subordinate agency thereof, upon which part of its authority may have been conferred, can alienate or surrender by grant, contract or other delegation." *Petersburg* v. *Aqueduct Co.,* 102 Va. 654, 659, 47 S. E. 848-9, and cases cited. The jurisdiction over the roads is a continuing one. The State Corporation Commission has found that the proposed underpass is in contravention of the clauses of the statute cited above, and

not only is its finding to be regarded as *prima facie* correct, but it is supported by the decided weight of the evidence.

[14] The railroad company, like individuals, is chargeable with knowledge of the law, and if, in reliance upon the resolution of the board of October 6, 1916, it has expended money in obtaining ground to build approaches to the underpass, such reliance cannot and does not bar the rights of the public, nor relieve the company of the obligation placed upon it by the statute, to build "an equally convenient road," and one that does not in any material degree impair, impede or obstruct travel on the county road. The duty to build such a road was a prerequisite to the right to disturb the existing crossing, and is a continuing duty whether there has been any change in the conditions since October 6, 1916, or not. The statute gave the public the right to demand such a crossing, and the board of supervisors could not take it away. Whether or not such a crossing was provided for is a question of fact to be determined by the evidence. This question, as we have seen, the State Corporation Commission had the right to investigate, and if its investigation showed that the proposed crossing was not such as the law required, then its construction, as a substitute for the old road, was a violation of law which the commission had power and authority to remedy. The resolution of October 6, 1916, though accepted and acted on by the railroad company, did not constitute such a contract as is protected by the Constitution, State or Federal.

The resolution of October 6, 1916, was rescinded by another resolution passed October 18, 1916. It is not clear from the record whether the railroad company was notified of the dissatisfaction with the first resolution before or after it purchased the land for the new right of way. The deed for the right of way is dated October 10, 1916, and was acknowledged October 12, 1916, and the evidence of Chairman Wood, hereinbefore recited, shows that the mat-

ter was brought to the attention of the railroad company about that time, and a conference on the ground touching the subject was invited. The highway had not then been actually invaded, and was not so invaded until after October 17, 1916. The company knew that the board was to meet on October 18, and two of its representatives were present on that day and presented the blue-print referred to in the record. The company's representative, Mr. Peyton, knew some days previously of the dissatisfaction with the former resolution, and if it did not know of the rescinding resolution of October 18 on the day of its passage, it was because it did not take the trouble to inform itself. It kept on with its work, meanwhile blocking the highway, until stopped by injunction in November, 1916. It regarded the resolution of October 18, 1916, we are informed by its counsel, as a nullity. If in this it was mistaken, and thereafter incurred expense which might have been avoided, it has no one but itself to blame. The chief expense prior to that time was the making of the fill and the building of the temporary road, but these had been determined upon beforehand, regardless of the character of the underpass to be put in, so that these expenditures cannot be said to have been made in reliance upon the resolution of October 6, 1916. The only remaining expense was the $1,300 paid for the site of the right of way. This doubtless could have been adjusted upon some equitable basis, if the suggested meeting on the ground had been held, as the record shows that the proceedings up to October 6th had been of the most friendly and pleasant nature. But the needs of the company were urgent, and the speedy construction of the double track was very desirable, and it elected to take the course pursued by it. If this election has caused the company additional loss, it must bear it. We have already pointed out why it could not enforce the supposed contract arising out of the resolution

of October 6, 1916. Whether it can recover anything for the loss sustained by reason of the purchase of the lot for the right of way is not before us for consideration, and we express no opinion on the subject.

The remaining question to be considered is, did the commission enter the proper order in the case? The finding of the commission, in effect, was that the 22 degrees underpass would involve the outlay of such a large sum of money as to make it unreasonable to require it; that the 90 degree underpass on a reverse curve was not safe for persons traveling on the public highway, but that a 45 degree underpass at the point indicated by the three engineers to whom the question was referred by the commission, all things considered, would be an "equally convenient" road. The 45 degree underpass, however, involved some changes in the county road approaching it. The commission thereupon entered the following order:

"Relying upon the expert opinion of said committee of engineers, approved by Mr. Abernathy, this commission thinks the construction of a 45 degree underpass, carrying the road 20 feet wide, with a perpendicular clearance of $13\frac{1}{2}$ feet, sufficient under existing conditions for the needs of the public; but the blue-print submitted by the committee of engineers shows that to put in a 45 degree underpass it would be necessary to relocate the public road for a short distance. This commission has no authority under the law to order the relocation of a public road. If the Southern Railway Company had taken steps to secure from the proper road authorities the relocation of the public road necessary to put in the 45 degree underpass, we would have so ordered; but the Southern Railway Company, having taken no steps to secure such authority, we are constrained to order the Southern Railway Company to clear the obstruction from the public road at North Garden and restore it to the use of the public as quickly as it can be done.

"Therefore, we order the obstruction be removed along the public road by the construction within thirty days of a trestle work or other support adequate to safely carry the tracks of the railroad, and that the embankment within such trestle work be removed, so that the public may have the use of the road, and that a permanent structure for such underpass along the old established road be put in, in accordance with the plans drawn by Mr. Glidden, engineer of the State Highway Commission, with perpendicular clearance of 13½ feet, and completed within sixty days.

"If, however, the Southern Railway Company will get permission from the proper road authorities to relocate the public road so that the 45 degree underpass can be constructed as shown by the drawings of said committee of engineers, carrying a perpendicular clearance of 13½ feet, and will proceed to construct a temporary trestle work, or other support adequate to carry the tracks of the railroad, within thirty days and put in and complete their permanent structure in accordance with said plans, as above provided, within sixty days, so that the public may have the use of the road, this commission will accept the construction of said 45 degree underpass as compliance with this order."

The jurisdiction of the commission to compel the railroad company to put in a proper crossing for the accommodation of the public travel on the highway carried with it, as incident, the power to locate the point at which the underpass was to be put in, and the character of the underpass, in order that the new road might be "equally convenient" with the old one. The change was being made at the instance, and for the benefit, of the railroad company, and it was proper, therefore, to require it to pay the entire expense not only of the underpass but also of the necessary approaches thereto.

[15, 16] While we are of opinion that the commission has

jurisdiction of the present controversy for the reasons hereinbefore stated, and that it is a proper case to require the underpass to be constructed at the cost of the railroad company, as a rule existing crossings should be left undisturbed unless the change is effected under the provisions of section 1294-d, clause 39, of the Code. That section clearly indicates that, as to existing grade crossings of county roads by railroads, when the local authorities desire to improve the county roads by separating the grades, they may require the railroad authorities to make the necessary change only upon the condition that the expense thereof be equally borne by the county and the railroad company. The jurisdiction of the commission to compel a separation of grades at existing crossings at the expense of railroad companies should only be exercised in exceptional cases, where the proof is clear and satisfactory that a duty rests upon the railroad company to make it, in consequence of some peculiar danger to the traveling public. All grade crossings are, more or less, inconvenient and dangerous, but mere inconvenience or necessary dangers usually incident to such crossings will not justify the exercise by the commission of jurisdiction to compel a separation of grades at the expense of the railroad companies. The continuation of existing grades should be the rule, the change of grade at the expense of the railroad company the exception, and this exception should not be made except for cogent reasons.

This proceeding, while in the name of the Commonwealth at the relation of the State Corporation Commission, was instigated by the board of supervisors of Albemarle county and certain citizens of that county. They were not parties, however, to the proceedings, and hence no decree could be made against them. But it was not proper to leave it in the power of that board to compel a skew underpass of 22 degrees, which could only be made at an unreasonable expense, when the commission had determined that a 45 de-

gree underpass would provide "an equally convenient road." What the commission should have ordered was the construction of the 45 degree underpass, with proper approaches thereto as shown by the report of the committee of engineers, *whenever the board of supervisors of Albemarle county filed with the commission its consent in writing to such an underpass.*

[17] In view of the great European war, in which the United States is a participant, and the consequent difficulty of getting materials of all kinds for railroad construction, of which this court will take judicial notice, we are of opinion that the time allowed the railroad company in which to construct the underpass is too short, and that the company should be required to install such underpass as soon as practicable, with leave to the said board of supervisors, or any person interested, to apply to the commission for any further order that may be necessary to insure the prompt construction of such underpass.

For the foregoing reasons the order of the State Corporation Commission will be reversed, and this court will enter such order as the State Corporation Commission ought to have entered. Costs will be awarded to the appellee as the party substantially prevailing.

*Reversed.*