# Richmond.

## Richmond, Fredericksburg and Potomac Railroad Company v. City of Richmond.

### June 17, 1926.

1. CONSTITUTIONAL LAW—*Inalienable Rights.*—Man as an individual possesses certain rights which are called inherent rights, inborn and inbred, the gift of his Maker, and essential to his existence and well being, such as the rights of life, liberty and the pursuit of happiness, which are not surrendered by entering into organized society. They existed before society was organized and are not surrendered by entering into the organization, and this is recognized in section one of the Constitution of 1902.

2. MUNICIPAL CORPORATIONS—*Inalienable Rights.*—Municipal corporations have no such inherent rights as those recognized by section one of the Constitution of 1902 as being possessed by individuals. Municipal corporations have no existence and hence no rights prior to the organization of society.

3. MUNICIPAL CORPORATIONS—*Character—Power—Creatures of State— Charter not a Contract.*—Municipal corporations are mere political subdivisions of the State created for the convenient administration of such governmental powers as may be entrusted to them. They are creatures of the State, which may grant or withhold such powers as to it shall seem meet. The State may grant these powers in whole or in part, conditionally or unconditionally, and may, at its pleasure, modify or withdraw them, with or without the consent of the citizens, or even against their protest. It may, if it chooses, repeal the charter and destroy the corporation. The charter is not a contract between the State and the municipality.

4. MUNICIPAL CORPORATIONS—*Police Power—Abridgment—Section 159 of the Constitution of 1902.*—Section 159 of the Constitution of 1902, providing that the exercise of police power of the State shall never be abridged, has reference to the police power of the State and not to the police power of municipal corporations.

5. MUNICIPAL CORPORATIONS—*Crossings—At Whose Expense Improvements Shall be Made—Case at Bar.*—In the instant case, an action by a railroad against a city for half the expense of improvements to "existing crossings," the power of the legislature to determine at whose expense such improvements should be madecannot be doubted.

8

6. Crossings—*Municipal Corporations—Expense of Improvements of Crossings—Claim of Set-off by City—Case at Bar.*—In the instant case, an action by a railroad against a city for half the . expense of improvements made at "existing crossings" by the railroad at the request of the city, the city claimed a set-off for certain drainage. The trial court committed no error in refusing to allow this set-off as the city contracted to pay for this drainage in a stipulation contained in the deed of dedication by the railroad to the city of an easement and right of way across the railroad for an avenue, and it formed a part, at least, of the consideration of that deed.

7. Crossings—*Municipal Corporations—Expense of Improving Crossings—Original Price Increased—Case at Bar.*—In the instant case, an action by a railroad against a city for one-half the expense of improvements at crossings, the railroad company had let to contract the building of bridges at the crossings. Owing to delay, for which the contractor was not responsible, the prices of material and labor having greatly increased in the meantime, the contractor refused to perform his contract, and the railroad company was compelled to relet the contract at a much higher price.

   *Held:* That the trial court did not err in holding the city liable for one-half of the increased price instead of the price fixed by the original contract, the court being satisfied that the railroad company did what was best in the interest of all parties.

8. Crossings—*Duty of Railroad—Inadequate Bridges—Continuing Duty.*—The duty of railroads as to the crossing of streets and highways is a continuing duty and however adequate a bridge may have been when constructed, if, from the increase of population or other cause, the bridge became inadequate for the convenience of the public, it is the duty of the railroad company to make it adequate.

9. Crossings—*Municipal Corporations—Improvements—Inadequate Bridge—Liability of City for Part of Cost of New Bridge—Case at Bar.*—In the instant case, an action by a railroad against a city for half the expense of the improvements at crossings, the city contended that it should be exonerated from any part of the cost of a certain bridge for the reason that the railroad voluntarily separated the grades at that point a number of years previously but built an inadequate bridge and not one in conformity with the laws of that time. The bridge when erected was accepted by the supervisors of the county in which it was then situated and no complaint was made of inadequacy either by the county or the city after annexation, or any demand for widening the bridge. The crossing was an "existing crossing" and the city was asking for its improvement by lowering the grade of the railroad and the construction of a new bridge the width of the street, and this was what the railroad company did. The reconstruction of the bridge was not because of its insufficiency nor in response to any continuing duty on the part of the railroad,

but to carry out a detail of a plan of improvement accepted both by the city and the railroad.

*Held:* That there was no merit in the city's contention and it was not liable for half the cost of the construction of the bridge.

10. MUNICIPAL CORPORATIONS—*Crossings—Liability of the Municipality—Bonus Given to Contractor by Railroad—Case at Bar.*—In an action by a railroad company against a city to recover half the cost of improvements at crossings, the city is not liable for any part of a sum paid by the railroad to the contractors in the nature of a bonus without consultation with the city.

11. MUNICIPAL CORPORATIONS—*Crossings—Liability of the Municipality—Interest—Case at Bar.*—In the instant case it was stipulated in a deed between a railroad and a city that in case it should be established in a proceeding to be instituted by the railroad that the city was liable for any part of the expense of improvements at crossings to be done by the company, the company would accept in settlement notes of the city for the amount so due by it, and the time for which interest was to run was fixed as "the date at which the portion of the expense to be paid by the city becomes due and payable."

*Held:* That this did not mean from the date of the judgment against the city in the proceedings by the railroad against the city, that judgment simply fixed the date at which the amount was to become due and payable and from that date, which was properly fixed by the judgment, interest was to run by the terms of the contract.

12. MUNICIPAL CORPORATIONS—*Crossings—Liability of the Municipality—Interest—Case at Bar.*—In the instant case it was stipulated in a deed between a railroad and a city that in case it should be established in a proceeding to be instituted by the railroad that the city was liable for any part of the expense of improvements at crossings to be done by the company, the company would accept in settlement notes of the city for the amount so due by it. The notes were to bear interest at the rate at which the city could borrow money which it was agreed was four per cent.

*Held:* That this agreement to pay four per cent on the amount in controversy meant that it was to carry that rate until payment and not merely until maturity.

13. MUNICIPAL CORPORATIONS—*Crossings—Liability of the Municipality—Interest—Case at Bar.*—In the instant case it was agreed between a railroad and a city that the railroad reserved the right to proceed against the city to recover one-half of the cost of the crossing improvements when work on the improvements should "have been completed and said expense paid." The agreement further provided for the payment of any balance found against the city in one and two years, with interest at the rate which the city could borrow from the banks.

*Held:* That the payment of interest during construction was not

contemplated by the parties; that their intention was that the sums actually paid out by the railroad should constitute the cost to be apportioned between them.

14. Crossings—*Grade Crossings—Policy of the State.*—In the earlier years of railroad construction and for many years thereafter the country was sparsely settled, and such construction was so greatly favored that it was the policy of the State to encourage grade crossings, in order to reduce the cost of construction. But with the increased traffic on the public highways, and the manifest danger of such crossings, the policy of the State was changed by the Act of 1902-3-4, page 968, and it was "declared to be the policy of this State that all crossings of one railroad by another, or of a county road or highway by a railroad, or of a railroad by a county road or highway, shall, wherever reasonably practical, pass above or below the existing structure."

15. Police Power—*Alienation or Abridgment.*—The police power of the State cannot be aliened or abridged by contract, or otherwise.

16. Police Power—*What Constitutes.*—To provide for the safety and welfare of the citizen is a police power.

17. Police Power—*Delegation to Municipality.*—The State may delegate to a city the exercise of so much of its police power within its limits as it may see fit.

18. Streets and Highways—*Streets are Public Highways.*—The streets of a city are public highways of the State.

19. Streets and Highways—*State may Control Streets—Delegation of Power to Municipality.*—The State exercises such control over the streets of a city as to it seems proper; this control may be exercised either directly or delegated to the city; and this delegation may be either in whole or in part, and conditionally or unconditionally.

20. Crossings—*Municipal Corporations—Liability of City—Nonexisting Crossing.*—In the instant case there has been a full and complete delegation to the city of Richmond of the police power of the State over its streets, except in the single instance of where an improvement in its streets at an "existing crossing" of a railroad involves an expense to the railroad, in which case the statute (Acts of 1902-3-4, page 968) provides that the "expense shall be borne equally" by the railroad company and the city. This is a condition annexed by the general law to the powers conferred by the charter of the city. The condition, however, is applicable only to "existing crossings." If there is no "existing crossing," but a new crossing is sought where none existed before, than the delegation of police power to the city is complete and the city may exercise the power so delegated.

21. Crossings—*Municipal Corporations—Liability of City—Nonexisting Crossing.*—A city under a full and complete delegation of the police power of a State over its streets, may require a railroad company

to depress its tracks at its own expense wherever reasonably necessary for the public safety.

22. Crossings—*Grade Crossings—Bridges and Viaducts—Police Power.*—It is well settled that railroad corporations may be required, at their own expense, not only to abolish existing grade crossings, but also to build and maintain suitable bridges or viaducts to carry highways, newly laid out, over their tracks or to carry their tracks over such highways.

23. Railroads—*Subject to the Police Power.*—All rights and privileges acquired by a railroad company are acquired and held subject to the police power of the State, or those to whom it is lawfully delegated.

24. Crossings—*Municipal Corporations—Liability of Municipality—Non-existing Crossings—Case at Bar.*—In the instant case, an action by a railroad against a city for half the expense of improvements at crossings, the railroad assigned as error that the trial court failed to allow a recovery by the railroad company of one-half of the cost of constructing a concrete bridge over a certain avenue, and one-half of the cost of depressing the tracks incident to this work. The avenue had not been extended as far as the railroad and there was no "existing crossings" of the railroad at that point.

*Held:* That the bridge at the avenue was one which the city had the right to require the railroad to erect at its own expense under Acts of 1902-3-4, page 968.

25. Crossings—*Municipal Corporations—Liability of Municipality—Subsections 38 and 39 of Section 1294-d of the Code of 1904.*—Subsection 38 of section 1294-d of the Code of 1904 applies only to crossings "hereafter constructed," while subsection 39 applies to "existing crossings," that is, crossings at the time the act was passed. Crossings in cities and towns are expressly excluded from the operation of section 38, but the future policy of the State, as expressed in the first sentence of section 38, is applicable to cities and towns as well as to the counties.

26. Crossings—*Municipal Corporations—When Expense of Improvements to be Borne by Railroad and when by County or Municipality—Code of 1904, Section 1294-d, Subsection 39.*—Under section 1294-d, subsection 39, of the Code of 1904, when an improvement of a crossing is made by a railroad, whether it be the repair or reconstruction of a crossing at grade, or involves an overhead or underpass crossing, if for the benefit of the railroad, and the railroad is the moving party, the party who desires to make a change in the existing conditions, then the company must make the improvements at its own expense. But if the improvement is sought and is for the benefit of a municipality or county, the expense is to be equally borne by the railroad company and the county or municipality.

27. Crossings—*Municipal Corporations—Liability of Municipality—Cost of*

*Depressing Tracks as Well as the Cost of the Bridges—Case at Bar.*—In the instant case, a proceeding by a railroad to recover one-half the expenses of improvements at crossings, under subsection 39 of section 1294-d of the Code of 1904, the trial court confined the railroad's recovery to one-half of the actual cost of bridges and of the track depression immediately under the bridges, that is, between the line of streets.

*Held:* That the city was liable not only for its share of the depression immediately under the bridges, but for its share of the actual cost of whatever was necessary to be done in order to effect a separation of the grades at the crossings; and, that in the instant case, the depression between the crossings was necessary to effect the depression at the crossings.

28. Crossings—*Municipal Corporations—Liability of Municipality—Cost of Depressing Tracks as Well as the Cost of the Bridges—Case at Bar.*—In the instant case, a proceeding by a railroad against a city for half the cost of improvements at crossings, the parties had entered into an agreement in which the city denied all liability for any of the cost of either the bridges or the depression of the tracks of the railroad, but agreed that the railroad should institute proceedings to determine its liability, and if it was found to be liable for any part of the cost, it would pay it upon certain terms. The improvements were made with reference to a general plan accepted both by the city and the railroad.

*Held:* That if under a fair construction of this agreement the city, if any liability attached to it, was liable for the cost of whatever was necessary for the railroad to do in order to effect a separation of grades at the crossings.

29. Words and Phrases—*Required.*—"Required" is often used in the sense of "necessary," but even if used in its more restricted sense when a city "required" a railroad company to depress its tracks at the various crossings, existing and projected, it "required" the company to do whatever was necessary to accomplish such depression.

30. Statutes—*Construction—Parent Statute—Subsections 38 and 39 of Section 1294-d of the Code of 1904—Application to Cities and Towns.*—There is nothing in the history of subsections 38 and 39 of section 1294-d of the Code of 1904 which excluded cities and towns from the operation of subsection 39, but, were it otherwise, the history of a parent statute cannot be allowed to override the positive language of a later enactment. The use of the words "street," "city" and "town," in subsection 39 points plainly to the application of the subsection to cities and towns. Furthermore, subsection 38, in terms, excludes "crossings in cities and towns" from its operation, while there is no such exclusion in subsection 39.

31. Municipal Corporations—*Crossings—Liability of Municipality—Sub-*

*section 39 of Section 1294-d of the Code of 1904—Applicability to the City or Railroad.*—Subsection 39 of section 1294-d of the Code of 1904 was enacted in 1904. At that time the city of Richmond and all other cities and towns of the State had general police powers over their streets. Subsection 39 was intended to curtail these powers to the extent indicated by its language.

32. Municipal Corporations—*Crossings—Liability of Municipality—Subsection 39 of Section 1294-d of the Code of 1904—Applicability to the City or Railroad.*—Subsection 39 of section 1294-d of the Code of 1904 took away from the cities and towns that police power as to cases arising thereunder, and these powers were not restored to the city of Richmond by an amendment to its charter simply continuing pre-existing powers. Subsections 38 and 39 embodied the public policy of the State, to be operative throughout the State, and, to the extent therein specified, the manner of its execution. The requirement that "the expense shall be borne equally" by the railroad and the county, city or town, under the conditions mentioned in subsection 39, is so explicit that it cannot be taken away except by enactment plainly showing such an intent. The 1908 amendment of the charter of Richmond is not such an enactment.

Error to a judgment of the Law and Equity Court of the city of Richmond, in an action of assumpsit. Judgment for defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*E. Randolph Williams* and *Wirt P. Marks, Jr.,* for the plaintiff in error.

*James E. Cannon* and *C. V. Meredith,* for the defendant in error.

Burks, J., delivered the opinion of the court.

When this case was decided by the trial court, the learned judge of that court delivered a written opinion, in which he made the following statement of facts:

"This is an action by the plaintiff Railroad Company against the city of Richmond, in which it claims the right to recover from the city one-half of the total cost of bridge building and construction work done in connection with the street crossings of its James River Division line, locally known as the belt line. The total amount, one-half of which it is claimed that the city should pay, results from the depression of the tracks of the railroad from Acca to Cary street and from the building of the bridges across the railroad tracks at the crossings at Broad street, Monument avenue, Patterson avenue and Grove avenue.

"In the year 1914 the city, by the extension of its corporate limits westwardly, brought within the limits of the city the entire line of railroad between the streets mentioned; the city limits having, in fact, been extended some distance beyond the entire line of railroad from Acca to the river. At that time—that is, when this railroad line was brought within the city—there was a track depression at Broad street and the street crossed the railroad tracks by a bridge thirty feet wide. The crossings at Grove avenue and Patterson avenue were grade crossings. Monument avenue had not then been extended westwardly as far as the railroad line.

"As the city grew westwardly, it became manifest to both the railroad and the city authorities that it was to the interest of both and for the benefit of the public that these grade crossings should be abolished, and that a proper bridge should be erected at the Broad street crossing so that the bridge there should be as wide as the street which at that point was sixty feet, whereas the bridge then there was only thirty feet wide, and that provision should be made for Monument avenue which the city contemplated to

extend, so that it would at an early date cross the railroad line.

"Negotiations between the city authorities and the railroad resulted in the passage of an ordinance approved on the 11th day of May, 1916, which contains the form of a deed to be executed by the railroad and by the mayor on behalf of the city. Under the terms of this deed the railroad company agreed to dedicate to the city the easement and right of way across the belt line for Monument avenue, and further agreed to depress its tracks according to a plan known as the Hankins revised plan, which met with the approval of both parties, and to construct overhead bridges for Broad street and Monument, Patterson and Grove avenues.

"This deed contains various stipulations. The last clause in the deed, which is the part of it most material to this litigation, is as follows:

" '4. That the work required to be done by the said company shall be by the company let to contract upon competitive bids from responsible bidders, who will be required to give bond and security for the faithful performance of the contract, and the said company will pay all the expense incident to the doing of the said work, but it is expressly understood that the said company reserves the right to institute legal proceedings against the city of Richmond when said work shall have been completed and said expense paid, to recover one-half of the said costs of said improvement, and in asserting this claim the rights of the city and of the company shall be the same as if this crossing had been made by proper legal proceedings without any agreement between the parties, but in such proceedings it shall not be maintained as the basis or reason for such recovery that such crossing

at Monument avenue is an "existing crossing" at the time of the making of this deed, or at the time of the institution of such proceedings; and in case it should be established in said proceedings that the city is liable for any part of the expense of the work to be done by the company, as hereinbefore provided, the company will accept in settlement the notes of the city for the amount so due by it, payable in one and two years from the date at which the portion of the expense to be paid by the city becomes due and payable, with interest at the rate at which the city can borrow money from the banks at the time of the execution of the notes.'

"The deed was executed by the city and the railroad on May 26, 1916, and subsequently this action was instituted under the language of the agreement or deed above quoted whereby the railroad asserted against the city the right to reimbursement for one-half of the total amount expended in all the work embraced within the agreement.

"It will be seen from the language of the clause of the agreement above quoted, that it was expressly stipulated that the railroad company reserved the right to institute legal proceedings against the city when the work was completed and all expenses paid to recover one-half of the cost of the improvement. The evidence shows that there was a dispute between the representatives of the railroad company and the representatives of the city as to the liability of the city for any part of the expense of this work. The railroad company asserted that one-half of the total amount to be expended should be paid by the city, while the city was advised that it was not liable for the total amount or any part of it.

"I take it to be manifest that the parties, after

various negotiations, having come to an agreement concerning the construction of this work, the liability of the city, the right to assert which the railroad company reserved, would result only from the statutory enactment making it liable. At that time it was possible that the railroad company could have been compelled to pay the entire amount, but only upon an application by the city, or some of its citizens, to the State Corporation Commission, based upon the ground of great danger to the public from the existing crossings. In such a case the Corporation Commission would have power to direct the railroad company to make the proper improvements, certainly as to a county road and possibly as to a city street. It is evident that such proceedings were not contemplated and were not in the minds of the parties when the agreement speaks of proper legal proceedings.

"The statutory law relative to the crossings at the intersection of public highways and the railroads was contained in clauses 38 and 39 of chapter 4 of the act concerning public service corporations, approved January 18, 1904, and carried in Pollard's Code of Virginia, 1904, as clauses 38 and 39 of section 1294-d. The dealings between the railroad and the city leading up to the enactment of the above mentioned ordinance and the execution of the deed in May, 1916, show that they differed as to the proper interpretation of this statute, and as to its application to the work to be undertaken.

"The above mentioned clauses 38 and 39 are as follows:

" '*Crossings of one railroad by another, or other highway; section not to apply to cities and towns or to electric railways.*

" '(38) It is hereby declared to be the policy of

this State that all crossings of one railroad by another, or of a county road or highway by a railroad, or of a railroad by a county road or highway, shall, wherever reasonably practicable, pass above or below the existing structure. And every railroad hereafter constructed across a railroad, shall, wherever it is reasonably practicable, and does not involve an unreasonable expense, all the circumstances of the case considered, pass above or beneath the existing structure at a sufficient elevation or depression, as the case may be, with easy grades, so as to admit of safe and speedy travel over each. The provisions of this section shall not apply to crossings in cities or towns, nor to electric railways within or without cities and towns.

" *'Respective duties as to crossings.*

" '(39) At every existing crossing, such as is mentioned in the preceding section, the grade of the work last constructed, to the full width of the road crossing, shall be made sufficiently smooth and level to admit of safe and speedy travel over such crossing. When such improvement is to be made in a railroad it shall be made by the corporation, company, or person operating the same. When it is to be made in a county road, street, or other highway, it shall be made by the corporation whose track is to be crossed, and the expense shall be borne equally by said corporation and by county, city, or town having control of such county road, street, or other highway. When the crossing is at an elevation the approaches and structures shall be safe, permanent, and substantial, and when the crossing is underneath the road to be crossed, the road, street, or highway and all necessary drains and ditches shall be put in good, permanent condition, and the structure supporting the road shall be safe, substantial and permanent. Whenever the character

of the work to be done on the structures, roads, streets, or highways, drains and ditches cannot be agreed to by the corporation and the county, city or town bearing the expense of the crossing, the same shall be fixed and determined by the State Corporation Commission. After said crossing has been constructed the corporation whose track or work is crossed shall maintain the same.'

"The determination of the points at issue between the litigants depends upon the construction to be given to these two clauses, there being, in fact, no other statutory law directly bearing upon the liability of the city under the circumstances appearing in this case."

In addition to the errors assigned by the railroad company several cross-errors are assigned by the city of Richmond. We shall consider the assignments in their proper order, regardless of who made them.

The railroad company seeks recovery under and by virtue of subsection 39 of section 1294-d of Pollard's Code of 1904, hereinbefore recited. The city denies any liability on the ground that subsection 39 is unconstitutional. The clauses of the Constitution upon which the city relies are sections 1 and 159 which are as follows:

"Section 1. That all men are by nature free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety."

"Section 159. * * * and the exercise of the police power of the State shall never be abridged, nor so construed as to permit corporations to conduct

their business in such manner as to infringe the equal rights of individuals or the general well being of the State."

[1, 2, 3] Man as an individual possesses certain rights which are called inherent rights, inborn and inbred, the gift of his Maker, and essential to his existence and well being, such as the rights of life, liberty and the pursuit of happiness, which are not surrendered by entering into organized society. They existed before society was organized and are not surrendered by entering into the organization. Municipal corporations have no such rights. They have no existence, and hence no rights prior to the organization of society. They are mere political subdivisions of the State, created for the convenient administration of such governmental powers as may be entrusted to them. They are creatures of the State, which may grant or withhold such powers as to it shall seem meet. The State may grant these powers in whole or in part, conditionally or unconditionally, and may, at its pleasure, modify or withdraw them, with or without the consent of the citizens, or even against their protest. It may, if it chooses, repeal the charter and destroy the corporation. The charter is not a contract between the State and the municipality. *Hunter* v. *Pittsburg*, 207 U. S. 161, 28 S. Ct. 40, 52 L. Ed. 151, 19 R. C. L. pp. 729-731 and cases cited. *Id.*, sec. 108, p. 800.

[4] Section 159 of the Constitution, also relied on, refers to the police power of the *State*, not of municipal corporations, and hence has no bearing on the question at issue. The exercise of the police power of the State with reference to municipal corporations, and the powers conferred upon them, has been so fully considered in recent cases as to render any further

discussion of the subject unnecessary. *Victoria* v. *Victoria Ice Co.*, 134 Va. 160, 114 S. E. 92, 28 A. L. R. 562; *Richmond* v. *Va. Ry. & P. Co.*, 141 Va. 69, 126 S. E. 353.

[5] In the instant case the power of the legislature to determine at whose expense an improvement at an "existing crossing" shall be made cannot be doubted.

[6] The city claimed a set-off for $6,185.40 paid by it for certain drainage, which the trial court refused to allow. This ruling is assigned as error. The trial court committed no error in refusing to allow this set-off. The city contracted to pay for this drainage in the stipulation contained in the deed of dedication, and it formed a part, at least, of the consideration for that deed.

[7] The railroad company had let to contract the building of the bridges at the crossings at Broad street, Patterson avenue and Grove avenue. Owing to delay for which the contractor was not responsible— the prices of material and labor having greatly increased in the meantime—the contractor refused to perform his contract, and the railroad company was compelled to relet the contract at a much higher price, and the city assigns as error the action of the trial court in holding it liable for one-half of the increased price, instead of the price fixed by the original contract. There was no error in this ruling of the trial court. We concur in the opinion of the learned trial judge on this subject, which is as follows: "I am satisfied from the evidence that the railroad company, under the circumstances, in abandoning its contract with George and entering into a new contract with Winston & Company, did what was best in the interest of all parties, and therefore they should be allowed the benefit of the expense incurred under the

contract with Winston & Company, and not be held to the smaller amount for which George had contracted to do the work, as contended for by the city."

[8, 9] The city contends that the trial court erred in "failing to exonerate the city from any part of the cost of the bridge at Broad street, for the reason that the railroad voluntarily separated the grades at this point in 1911, but built an inadequate bridge and not one in conformity with laws at that time." In the brief of counsel for the city it is said:

"This assignment is predicated upon the theory that the Broad street bridge, within the purview of the statute and under the authorities, stands upon a footing dissimilar to that of the Patterson and Grove avenue bridges. It will be recalled that the railroad, pursuant to permission of the supervisors of Henrico county, made a voluntary separation of the grades at Broad street in the year 1911. Under clause 3 of chapter 2 of the act of January 18, 1904, concerning public service corporations (in force when this original separation was made), it was provided in a case of this sort that a county road might be altered whenever the railroad, having previously secured the consent of the board of supervisors, should make an equally convenient road in lieu thereof. Instead of complying with this statutory requirement, the railroad raised the grade of Broad street and built approaches or causeways to the bridge erected by it on a four per cent. grade. These approaches and the bridge itself were only thirty feet wide, whereas Broad street was a splendid avenue with a width of sixty feet. Thus for a distance of more than 1,300 feet the width of this street was reduced fifty per cent."

Counsel for the city then quote and discuss at length the decisions of this court to the effect that the duty of the railroad company was a continuing duty, and however adequate the bridge may have been when constructed, if, from the increase of population or other cause, the bridge became inadequate for the convenience of the public, it was the duty of the railroad company to make it adequate. They rely on *Charlottesville* v. *Southern R. Co.*, 97 Va. 428, 34 S. E. 98; *Washington, &c., R. Co.* v. *Alexandria*, 98 Va. 344, 36 S. E. 385; *Norfolk & W. R. Co.* v. *Bristol*, 116 Va. 955, 83 S. E. 421, and *Supervisors* v. *Norfolk & W. R. Co.*, 119 Va. 763, 91 S. E. 124.

The law as stated in the above cases is not denied, but it is said not to be applicable. The bridge when erected was accepted by the supervisors of Henrico county, in which it was then situated, and from that time to this no complaint has been made of the inadequacy. The city has never made that complaint, nor any demand for widening of the bridge and its approaches. It proposed to change the grade of its street occupied by the approaches, and had adopted the "Hankins revised plan," disposing of the elevated approaches and showing a gradual depression of the grade of the tracks of the railroad company from Acca to James river. This involved the removal of the approaches and the old bridge and the construction of an entirely new bridge the width of Broad street. One of the reasons for adopting the Hankins revised plan was purely aesthetic. In the report of the subcommittee to the street committee having this matter in charge it is said:

"The Hankins plan provides for a material reduction in the present awkward and unsightly overhead

crossing of Broad street across the belt line tracks by lowering the present grade of Broad street at this point some ten or twelve feet, which is admittedly a most desirable thing to be done."

The crossing was an "existing crossing" and the city was asking for its improvement by lowering the grade of the railroad and the construction of a new bridge the width of Broad street, and this is what the railroad company did. The Hankins plan adopted by the city and accepted by the railroad company made no distinction between the bridge at Broad street and Patterson avenue and Grove avenue. They were all parts of the plan for improvements in the western part of the city which was sought by the city. The reconstruction of the Broad street bridge was not because of its insufficiency, nor in response to any continuing duty on the part of the railroad company, but to carry out a detail of the Hankins revised plan. We find no error in the judgment of the trial court on this question.

[10] The railroad company assigns as error the refusal of the trial court to consider as a part of the cost of the work any part of an extra payment of $48,099.09 to the contractors who depressed the track. Without discussing the testimony on the subject, we concur in the opinion of the trial judge, who said: "I think the evidence shows that this was rather in the nature of a bonus; that it was paid without consultation with the city, and therefore the city should not be made to pay any part of it."

[11] The judgment against the city carries interest at four per cent from October 1, 1920. The railroad complains of the application of the four per cent rate after the expiration of the period of credit agreed upon,

and the city complains of the allowance of any interest prior to the date of the judgment, as the question of liability of the city was not ascertained until the judgment was rendered.

It was stipulated in the deed of dedication that in case it should be established in the proceedings to be instituted by the railroad company "that the city is liable for any part of the expense of the work to be done by the company as hereinbefore provided, the company will accept in settlement the notes of the city for the amount so due by it, payable in one and two years from the date at which the portion of the expense to be paid by the city becomes due and payable, with interest thereon at the rate at which the city can borrow money from the banks at the time of the execution of the notes."

The parties agreed that the city could borrow money from the banks at four per cent.

The stipulation above quoted fixes the time from which interest is to run as "the date at which the portion of the expense to be paid by the city becomes due and payable," not from the date of the judgment against the city. The judgment simply fixed the date at which the amount due became "due and payable," and from that date interest was to run by the terms of the contract. The trial court properly fixed this date as October 1, 1920. If the contention of the city were right, it would be an inducement to the debtor to put off payment, by litigation or otherwise, as long as possible. The judgment of the trial court on this question is plainly right.

[12] The rate of interest after maturity presents more difficulty—not because of anything contained in section 6259 of the Code, because we do not think that section affects the question, but because of the

stipulation of the parties. The agreement, in effect, was that half of the sum found due was to be paid "one year after date with interest from date at four *per cent per annum*," and the other half in two years, etc. What do the quoted words mean? Is the four per cent to run only "*till maturity*," or "*till paid?*" The question is one which has greatly perplexed the courts, and it is difficult to say where the weight of authority lies. **15 R. C. L., p. 22**, and cases cited.

We have no direct authority on the subject in this State, but in *Cecil* v. *Hicks*, 29 Gratt. (70 Va.) 1, 26 Am. Rep. 391, where similar language was used in a note stipulating to pay interest at twelve per cent (which was permissible, though six per cent was the legal rate in the absence of a contract for a higher rate), it was held that the note carried the higher rate "*till payment.*" This holding was followed, under similar conditions, in *Evans* v. *Rice*, 96 Va. 50, 30 S. E. 463. By parity of reasoning, the agreement to pay four per cent on the amount in controversy meant that it was to carry that rate "*until payment.*" The judgment of the trial court accords with this view, and is therefore approved.

[13] In submitting the cost of construction, the railroad company included interest during construction, amounting to $15,166.05. Of this item the trial court said: "I am satisfied from the evidence that this item should not be allowed." We find no evidence in the record on this subject except what is contained in stipulation 4 of the dedication deed, made a part of the agreement of the parties, whereby the railroad company reserved the right to recover from the city one-half of the cost of the improvement "when said work shall have been completed and said expense paid." The same stipulation 4 provides for the pay-

ment of any balance found against the city in one and two years, with interest at the rate at which the city could borrow money from the banks, which it is agreed is four per cent. Whatever may be the rule in calculating reproduction cost for the purpose of fixing rates, we are of the opinion that the payment of interest during construction was not within the contemplation of the parties; that their intention was that the sums actually paid out by the railroad company should constitute the cost to be apportioned between them, and that even as to this sum the railroad company would be·liberal both as to the time of payment and the rate of interest. There were reasons why the railroad company could afford to be liberal with the city, amongst others, the reduction of its grade from 1.33 per cent to .5 per cent, and dispensing with gates and watchmen. On this item, we approve the finding of the trial court.

It is assigned as error that the trial court failed to allow a recovery by the railroad company of one-half of the cost of constructing the concrete bridge over Monument avenue, and one-half of the cost of depressing the tracks incident to this work.

Monument avenue had not then been extended as far as the railroad, and there was no "existing crossing" of the railroad at that point. The statute applicable to the case is contained in the Acts of 1902-3-4, page 968, and so far as necessary has already been quoted. The parent statute is contained in Acts 1883-4, ch. 422, sections 1 and 2, page 528, and was carried into the Code of 1887 as sections 1095 and 1096.

[14] In the earlier years of railroad construction and for many years thereafter the country was sparsely settled, and such construction was so greatly favored that it was the policy of the State to encourage grade

crossings, in order to reduce the cost of construction. But with the increased traffic on the public highways, and the manifest danger of such crossings, the policy of the State was changed by the Act of 1902-3-4, *supra*, and it was "declared to be the policy of this State that all crossings of one railroad by another, or of a county road or highway by a railroad, or of a railroad by a county road or highway, shall, wherever reasonably practical, pass above or below the existing structure." The legislature recognized the former policy of the State in encouraging grade crossings, and the hardship that would be imposed on the railroads by this change of policy, if they were required "wherever reasonably practical" to change all of their grade crossings to nongrade crossings, at their own expense, so the act in question undertook to provide for two situations: (1) Where there was no crossing at the time the act took effect, but one was to be made thereafter, and (2) where there was at that time an "existing crossing." In the latter case, it is provided that when the improvement is to be made in a city street, it shall be made by the railroad company, and that the expense thereof shall be borne equally by the railroad company and the city.

[15-19] There are certain propositions of law applicable to the instant case that are either admitted or so well settled as not to require the citation of authority. Among them are the following: That the police power of the State cannot be aliened or abridged by contract, or otherwise; that to provide for the safety and welfare of the citizen is a police power; that the State may delegate to a city the exercise of so much of its police power within its limits as it may see fit; that the streets of a city are public highways of the State; that the State may exercise such control over them as

to it seems proper; that this control may be exercised either directly, or delegated to the city; and that this delegation may be either in whole or in part, and conditionally or unconditionally.

[20] In the instant case there has been a full and complete delegation to the city of Richmond of the police power of the State over its streets, except in the single instance of where an improvement in its streets at an "existing crossing" of a railroad involves an expense to the railroad, in which case the statute provides that the "expense shall be borne equally" by the railroad company and the city. This is a condition annexed by the general law to the powers conferred by the charter of the city. The condition, however, is applicable only to "existing crossings." If there is no "existing crossing," but a new crossing is sought where none existed before, then the delegation is complete and the city may exercise the power so delegated.

[21] That a city, under such a delegation, may require a railroad company to depress its tracks at its own expense wherever reasonably necessary for the public safety has been so often decided that it does not seem necessary to do more than refer to a few of the cases which cite others upon the same or kindred subjects involving the exercise of the police power.

*Denver & Rio Grande R. Co.* v. *Denver,* 250 U. S. 451, 39 S. Ct. 450, 63 L. Ed. 958, was a suit to enjoin the enforcement of an ordinance directing the removal of a railway track which had been held for nearly fifty years under an ordinance which the court assumed to constitute a contract, and to vest property rights in the railway. Upon this subject the court, amongst other things, said: "But, as this court often has held, such contracts and rights are held subject

to the fair exercise by the State, or the municipality as its agent, of the power to adopt and enforce such regulations as are reasonably necessary to secure the public safety; for this power 'is inalienable even by express grant,' and its legitimate exertion contravenes neither the contract clause of the Constitution nor the due process clause of the fourteenth amendment. *Atlantic Coast Line R. Co.* v. *Goldsboro*, 232 U. S. 548, 558, 34 Sup. Ct. 364, 58 L. Ed. 721; *Chicago & Alton R. Co.* v. *Tranbarger*, 238 U. S. 67, 76, 35 Sup. Ct. 678, 59 L. Ed. 1204. Of course, all regulations of this class are subject to judicial scrutiny, and where they are found to be plainly unreasonable and arbitrary must be pronounced invalid, as transcending that power and falling within the condemnation of one or both, as the case may be, of these constitutional restrictions.

"The scope of the power and instances of its application are shown in the decisions sustaining regulations (a) requiring railroad companies at their own expense to abrogate grade crossings by elevating or depressing their tracks and putting in bridges or viaducts at public crossings. *Northern Pacific R. R. Co.* v. *Duluth*, 208 U. S. 583, 28 Sup. Ct. 341, 52 L. Ed. 630; *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Minneapolis*, 232 U. S. 430, 34 Sup. Ct. 400, 38 L. Ed. 671; *Missouri Pacific Ry. Co.* v. *Omaha*, 235 U. S. 121, 35 Sup. Ct. 52, 59 L. Ed. 157; (b) requiring a railroad company at its own cost to change the location of a track and also to elevate it as a means of making travel on a highway safe, *New York, etc., R. R. Co.* v. *Bristol*, 151 U. S. 556, 14 Sup. Ct. 437, 38 L. Ed. 269; (c) prohibiting a railroad company from laying more than a single track in a narrow busy street although its franchise authorized it to lay a double track there, *Baltimore* v.

*Baltimore Trust Co.*, 166 U. S. 673, 17 Sup. Ct. 696, 41 L. Ed. 1160; and (d) requiring a gas company whose mains and pipes were laid beneath the surface of a street under an existing franchise to shift them to another location at its own cost to make room for a public drainage system, *New Orleans Gas Co.* v. *Drainage Commission*, 197 U. S. 453, 25 Sup. Ct. 471, 49 L. Ed. 831."

[22] In *Erie R. R. Co.* v. *Board of Public Utility Commissioners*, 254 U. S. 394, 41 S. Ct. 169, 65 L. Ed. 322, the city of Paterson undertook to require the Erie Railway to separate grades at a number of crossings at great cost. It made the usual defenses in regard to due process, impairing the obligation of contracts, taking property without compensation, abridging the privileges of communities and citizens, and also that it interfered with interstate commerce. In the course of the opinion by Mr. Justice Holmes, it is, amongst other things, said: "Most of the streets concerned were laid out later than the railroads and this fact is relied upon, so far as it goes, as an additional reason for denying the power of the State to throw the burden of this improvement upon the railroad. That is the fundamental question in the case. It might seem to be answered by the summary of the decisions given in *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Minneapolis*, 232 U. S. 430, 438, 34 Sup. Ct. 400, 401 (58 L. Ed. 671). 'It is well settled that railroad corporations may be required, at their own expense, not only to abolish existing grade crossings but also to build and maintain suitable bridges or viaducts to carry highways, newly laid out, over their tracks or to carry their tracks over such highways.' *Missouri Pacific Ry. Co.* v. *Omaha*, 235 U. S. 121, 35 Sup. Ct. 82, 59 L. Ed. 157; *Northern Pacific Ry. Co.* v. *Puget Sound & Willapa*

*Harbor Ry. Co.*, 250 U. S. 332, 39 Sup. Ct. 474, 63 L. Ed. 1013. For although the statement is said to be explained as a matter of State law by the previous decisions in Minnesota, it is made without reference to those decisions or to any local rule, and moreover the intimation of the judgment in the present case is that whatever may have been the earlier rulings, the law of New Jersey now adopts the same view.

\*        \*        \*        \*        \*

"Grade crossings call for a necessary adjustment of two conflicting interests—that of the public using the streets and that of the railroads and the public using them. Generally the streets represent the more important interest of the two. There can be no doubt that they did when these railroads were laid out, or that the advent of automobiles has given them an additional claim to consideration. They always are the necessity of the whole public, which the railroads, vital as they are, hardly can be called to the same extent. Being places to which the public is invited, and that it necessarily frequents, the State, in the care of which this interest is and from which, ultimately, the railroads derive their right to occupy the land, has a constitutional right to insist that they shall not be made dangerous to the public, whatever may be the cost to the parties introducing the danger. That is one of the most obvious cases of the police power, or to put the same proposition in another form, the authority of the railroads to project their moving masses across thoroughfares must be taken to be subject to the implied limitation that it may be cut down whenever and so far as the safety of the public requires. It is said that if the same requirement were made for the other grade crossings of the road it would soon be bankrupt. That the States might be

so foolish as to kill the goose that lays the golden egg for them, has no bearing on their constitutional rights. If it reasonably can be said that safety requires the change, it is for them to say whether they will insist upon it, and neither prospective bankruptcy nor engagement in interstate commerce can take away this fundamental right of the sovereign of the soil. *Denver & Rio Grande R. R. Co.* v. *Denver,* 250 U. S. 241, 246, 39 Sup. Ct. 450, 63 L. Ed. 958. To engage in interstate commerce the railroad must get on to the land, and to get on to it must comply with the conditions imposed by the State for the safety of its citizens. Contracts made by the road are made subject to the possible exercise of the sovereign right. *Denver & Rio Grande R. R. Co.* v. *Denver,* 250 U. S. 241, 244, 39 Sup. Ct. 450, 63 L. Ed. 958; *Union Dry Goods Co.* v. *Georgia Public Service Co.,* 248 U. S. 372, 39 Sup. Ct. 117, 63 L. Ed. 309 [9. A. L. R. 1420]; *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; *Northern Pacific Ry. Co.* v. *Duluth,* 208 U. S. 583, 28 Sup. Ct. 341, 52 L. Ed. 630; *Manigault* v. *Springs,* 199 U. S. 473, 480, 26 Sup. Ct. 127, 50 L. Ed. 274. If the burdens imposed are so great that the road cannot be run at a profit it can stop, whatever the misfortunes the stopping may produce. *Brooks-Scanlon Co.* v. *R. R. Commissioners,* 251 U. S. 396, 40 Sup. Ct. 183, 64 L. Ed. 323. Intelligent self interest should lead to a careful consideration of what the road is able to do without ruin, but this is not a constitutional duty. In the opinion of the court below the evidence justified the conclusion of the board that the expense would not be ruinous. Many details as to the particular situation of this road are disposed of without the need of further mention by what we have said thus far.''

The police power of the State has been uniformly upheld in this State under varying circumstances. *Richmond & Fredericksburg R. Co. v. Richmond,* 26 Gratt. (67 Va.) 83; *Davenport & Morris v. Richmond,* 81 Va. 636, 59 Am. Rep. 694; *Roanoke Gas Co. v. Roanoke,* 83 Va. 810, 14 S. E. 665; *Bellenot v. Richmond,* 108 Va. 314, 61 S. E. 785; *Charlottesville v. So. R. Co.,* 97 Va. 428, 34 S. E. 98; *Petersburg v. Petersburg Aqueduct Co.,* 102 Va. 654, 47 S. E. 848; *Norfolk & Portsmouth R. Co. v. Comth.,* 103 Va. 289, 49 S. E. 39; *Strawberry, &c., Corp. v. Starbuck,* 124 Va. 71, 97 S. E. 362; *Southern R. Co. v. Comth.,* 124 Va. 36, 97 S. E. 343; *Richmond v. C. & P. Tel. Co.,* 127 Va. 612, 105 S. E. 127; *Richmond v. Va. R. & P. Co.,* 141 Va. 69, 126 S. E. 353.

[23] All rights and privileges acquired by a railroad company are acquired and held subject to the police power of the State, or those to whom it is lawfully delegated.

[24] As the bridge at Monument avenue was one which the city had the right to require the railroad company to erect at its own expense, the trial court committed no error in refusing to charge the city with any portion of the cost thereof.

[25] The railroad company complains of the action of the trial court in limiting its recovery to one-half of the cost of the bridges and of the depression of its tracks immediately under the bridge at Broad street, Patterson avenue and Grove avenue. The proper solution of its complaint involves the interpretation of subsections 38 and 39 of section 1294-d of Pollard's Code, 1904, hereinbefore quoted in the statement of facts. As heretofore stated, section 38 applies only to crossings to be "hereafter constructed," while section 39 applies to "existing crossings"—that is, crossings

at the time the act was passed. Crossings in cities
and towns are expressly excluded from the operation
of section 38, but the future policy of the State, as
expressed in the first sentence of section 38, is appli-
cable to cities and towns as well as to the counties.

[26] Section 39, as is hereinafter pointed out, is
applicable to crossings in cities and towns as well as
those in counties. It deals with "existing crossings"
as distinguished from crossings "hereafter constructed."
It contemplated that work might or would have to be
done which would result in the "improvement" of the
crossing, and it undertook to provide by whom such
improvement should be paid for. It did not limit or
restrict the character of the improvement. It might
be the repair or reconstruction of a crossing at grade,
or it might involve an overhead or underpass cross-
ing.

"When such improvement is to be made in a rail-
road," that is for its benefit, when the railroad com-
pany is the moving party, the party who desires to
make a change in the existing conditions, when the
company must make the "improvement" at its own
expense. But if the improvement "is to be made in a
county road, street or other highway," that is, for its
benefit, and when it is the moving party who is asking
the change, then the expense shall be borne equally"
by the railroad company and the county, city or
town, as the case may be. Such was the construction
placed upon the statute by the trial court, and we
think correctly.

These crossings were made in 1891 and accorded
with the then policy of the State. When that policy
was changed, it seemed equitable that those who asked
to have them abolished should be required to pay a
part of the costs thereof. Whatever the legislature

might have done in the exercise of the police power of the State, the abolition of all grade crossings in the State, at the expense of the railroad companies, would probably have bankrupted them, it would certainly have seriously crippled them financially, and this, for manifest reasons, it could not afford to do. Hence the provision of the statute.

This accords with the holding in *Southern Ry. Co.* v. *Comth.*, 124 Va. 36, 97 S. E. 343.

[27] The learned judge of the trial court, however, confined the plaintiff's recovery to one-half of the actual cost of the bridges and of the track depression immediately under the bridges—that is, between the lines of the streets. In this view we cannot concur. We are of opinion that the city is liable not merely for its share of the depression immediately under the bridges, but for its share of the actual cost of whatever was *necessary to be done* in order to effect a separation of the grades at the crossings. What is to be paid for is the expense of the improvement at the crossing, and the improvement is whatever is *necessary* to be done in order to effect the crossing. If a proper crossing cannot be made without lowering the grade on either side of the actual crossing, then such lowering is necessary to effect the crossing, and is a necessary part of the expense of the crossing. It is like a "way of necessity" which exists, under proper circumstances, by virtue of the grant, though not specifically mentioned in the grant. So here, whatever is absolutely necessary to effect the crossing is as much a part of the expense of making the crossing as if it were specifically mentioned. The duty to make the crossing carries with it the necessary incidental duties.

Without going into details, we think it may be safely stated as a fact appearing from the record, that

the depression *between* crossings was necessary to effect the depressions *at* the crossings. Not only so, but such necessity was practically admitted by the city. The question at issue between the city and the railroad company was, not whether the depression from Acca to the north side of James river was necessary, but who should pay for it. Soon after the railroad was taken into the city limits, the council of the city of Richmond adopted an ordinance (May 14, 1915) by which the street committee was directed, with the aid and advice of the city engineer and the city attorney, "to negotiate with the Richmond, Fredericksburg and Potomac Railroad Company, looking to the lowering of the grade of their belt line railway *from the north side of James river to the corporate limits of the city of Richmond north of Broad street, so as to avoid, as far as practicable, grade crossings at all the intervening streets and alleys.*" (Italics supplied.) At that time the city had no right of way over the property of the railroad company at Monument avenue. The avenue had not at that time been extended as far as the railroad. Thereafter, there was much correspondence between counsel for the city and counsel for the railroad company, and there were several communications between the city attorney and the street committee until an agreement was reached culminating in the deed of dedication from the railroad company to the city of a right of way over the property of the railroad company at the proposed extension of Monument avenue. All of the communications dealt with, or referred to, the whole line from Acca to the north side of James river. The deed of dedication which was accepted by the city by an ordinance approved May 11, 1916, contained certain agreements between the city and the railroad company, among them the following:

"1. That the parties hereto accept the whole of the plan for crossing the belt line right of way of the company with its several streets and avenues, except the opening of Lee street east of 'C' street and Cutshaw avenue between 'B' and 'C' streets, as set out in the report of the committee of the administrative board reported to the street committee on January 17, 1916, known as the 'Revised Hankins plan,' * * * * and also the profiles referred to, showing the grades of all the streets and avenues above mentioned.

"2. The said company shall proceed with all reasonable dispatch to do the necessary work of lowering its tracks on said belt line to the grade provided for in said plans and profiles, and of constructing the bridges provided in said plan over Broad street, Monument, Patterson and Grove avenues, when the city of Richmond has acquired the right of way for Monument avenue through the property of W. S. Forbes, &c. * * *

"4. That the work required to be done by the said company shall be by the company let to contract upon competitive bids from responsible bidders, who will be required to give bond and security for the faithful performance of the contract, and the said company will pay all the expenses incident to the doing of the said work, but it is expressly understood that the said company reserves the right to institute legal proceedings against the city of Richmond, when the work shall have been completed and said expense paid, to recover one-half of the said cost of said improvement, and in asserting this claim the rights of the city and of the company shall be the same as if this crossing had been made by proper legal proceedings without any agreement between the parties, but in such proceedings it shall not be maintained as the basis or

reason for such recovery that such crossing at Monument avenue is an 'existing crossing' at the time of the making of this deed, or at the time of the institution of such proceedings; and in case it should be established in such proceedings that the city is liable for any part of the expense of the work to be done by the company, as hereinbefore provided, the company will accept in settlement the notes of the city for the amount so due by it, payable in one and two years from the date at which the portion of the expense to be paid by the city becomes due and payable, with interest thereon at the rate at which the city can borrow money from the banks at the time of the execution of the notes.''

[28] The "Hankins revised plan" showed seventeen longitudinal streets, existing or projected, that would cross the railroad, gave the grades of these streets, and also showed the necessary grading to be done by the railroad company in order to allow overhead crossings at all of the streets from Acca to the north side of the James river. "The work required to be done by the said company" referred to in paragraph 4 of the above agreement was the work required by the "Hankins revised plan" in order to provide overhead crossings for all the streets between Acca and the north side of James river. This is shown by paragraph 2 and also by the report of the subcommittee to the committee on streets, where it is said: "Under the Hankins plan it must be borne in mind that there is a uniform descending grade from the 'Y' at Acca to the north end of the James river bridge." Furthermore, the "Hankins revised plan" estimated that the cost of depressing the tracks and the construction of the bridge would amount to $651,000. Paragraph 4 above also provides that the work above mentioned "shall be, by the

company, let to contract upon competitive bids from responsible bidders, who will be required to give bond and security for the faithful performance of the contract.''

It is difficult to understand why such a provision should have been inserted in the contract of the parties, if the limit of the city's liability was only its share of the cost of depressing the tracks immediately under the bridges. A fair construction of the agreement of the parties contained in the deed of dedication, in the light of the surrounding circumstances, is that the city denied all liability for any part of the cost of either the bridges or the depression of the tracks of the railroad, but that if any liability attached it was for its share of the cost of whatever it was necessary for the railroad company to do in order to effect a separation of the grades at the crossing. Color is also lent to this construction by the fact that the city's own engineering department estimated the whole cost of construction at $651,000, and the city provided in the contract for time within which to make payment of any judgment which might be rendered against it.

[29] It was argued for the city that the word "required" in the first line of paragraph 4 shows that the city never contemplated any liability for any cost except immediately at the crossings, as the city had no control over the railroad company's right of way at any other points and could not *require* it to reduce its grade between crossings. This is a strained construction of the word "required." Reading the instrument as a whole, especially in the light of the surrounding circumstances, it is plain that it is used in the sense of necessary. This is a very common use of "required," as the work *required* to make an athlete; the study required to take a degree. But even in the

restricted sense contended for, when the city "required" the railroad company to depress its tracks at the various crossings, existing and projected, it "required" the company to do whatever was necessary to accomplish such depression.

As hereinbefore stated, the "Hankins revised plan" called for a uniform descending grade from the "Y" at Acca to the north end of the James river bridge, and in view of the agreed facts, the city cannot escape liability for one-half of the actual costs of the depression along the whole line between the termini above mentioned. It denied liability "for any of the cost of this work" but admitted that the "Hankins revised plan" had been accepted by both parties, with certain minor exceptions immaterial to the present controversy, and, in effect, if not in fact, that the work called for by that plan was necessary to effect a separation of the grades at the street crossings. If necessary, it inheres in the rights and liabilities of the parties.

We have reached our conclusion on principle. No case has been cited involving the exact question we have before us, but authority is not lacking to support the principle involved.

In the case of *In re State Highway Commission*, 193 N. Y. Supp., p. 808, 201 App. Div. 941, under a statute providing for the apportionment of costs, the New York court held that the cost of building approaches to an overhead bridge was a cost incident to the change, although it was not on the railroad right of way, and followed the holding in *In re New York Central, &c.*, 200 N. Y. 121, 93 S. E. 515, that the cost to be apportioned should "include only such cost as is necessary to cross the existing tracks of the railroad company with the necessary approaches and connecting streets leading thereto."

In the case of *Chicago, &c., R. Co.* v. *Public Service*

*Commission*, 187 Ind. 20, 118 N. E. 125, in construing the State statute, it was held that the approaches to an overhead bridge along the highway should be included in the cost of the separation. The costs of the approaches were incidental costs necessary to the completion of the undertaking.

In *Corkendall* v. *Kingsland*, 115 Misc. Rep. 557, 188 N. Y. Supp. 769, the court held that "the cost of construction of sidewalks, pavements, sewers and guardrails," were elements in the cost of eliminating a grade crossing, and were to be apportioned under the statute.

*In re City of Newton*, 172 Mass. 5, 51 N. E. 183, the railroad company was seeking to hold the city liable for its part of the cost of the new station and of the substitution of a ninety-five rail for a seventy-two rail, and the court held that neither of these items could be properly included as a part of the cost of the "total actual cost of the alterations." In the course of the opinion it is said: "The statute applies to existing conditions, and contemplates the abolition of grade crossings by means of changes and alterations in existing conditions. Except so far as is necessary to accomplish the proposed abolition, the existing conditions are, for aught that appears, to continue substantially as before. If the proposed abolition cannot be accomplished except by discontinuing an existing way and building a new way, or by relocating the railroad, that may be done. But this does not alter the fact that the statute contemplates a continuance of existing conditions, subject to such changes in them as may be required to accomplish the abolition of the crossing at grade. This does not prevent the railroad company or a city or town from making at its own expense any improvements which it may deem advisable in view of the changes which have

been or may be ordered; but we think that it confines the expense which is to be apportioned to that which is to be incurred in making the alterations which are expressly directed, and to that which is rendered necessary to adapt existing structures and arrangements to such alterations. Such last named expense must be considered as incident to, and a part of, that contemplated by the alterations which are ordered.

\*　　　\*　　　\*　　　\*　　　\*

"Neither do we think that the statute should be construed so strictly as to limit the actual cost to expenditures made in literal compliance with the directions of the commissioners, and to exclude all others. 'The total actual cost of the alterations' well may be held to include, not only expenditures made directly upon the alterations themselves, but also those which are rendered necessary to restore existing buildings and structures relatively to their former condition, and to replace in a proper and workmanlike manner the rails, ties, platforms, and other things which have been removed or damaged in the work of alteration."

In *Mayor of Worcester* v. *Boston, &c., R. Co.* (1917), 225 Mass. 548, 114 N. E. 814, it was held that the cost of removal of telegraph poles and wires made necessary by the elimination of a grade crossing was a part of the expense incident to the improvement and to be apportioned between the parties. It does not appear that the poles and wires were originally situated at the crossing itself, but the allowance was made for such cost as a necessary incident to the building of the crossing. It was, of course, no part of the crossing itself.

In *People* v. *Public Service Commission*, 168 N. Y. Supp. 832, 181 App. Div. 465, it was held that the

expenditures necessarily incurred by a railroad company in the elimination of a railroad crossing was part of the cost to be expended, although the cost in part involved the removal of structures of other companies. The court stated that while the commission might have required the other companies to remove their structures, yet the railroad company had no such power, and should not be required to pay the entire cost, and it was proper to apportion the cost.

To the same effect see *Marshall's Special Road Dist.* v. *Mo., &c., R. Co.,* P. U. R. 1921C, 156 (abstract), and *Nevada* v. *A. T., &c., R. Co.,* P. U. R. 1922E, 419.

[30] We find nothing in the history of subsections 38 and 39 which excludes cities and towns from the operation of subsection 39, but, were it otherwise, the history of a parent statute cannot be allowed to override the positive language of a later enactment. The use of the words "street," "city" and "town," in subsection 39 points plainly to the application of the subsection to cities and towns. Furthermore, subsection 38, in terms, excludes "crossings in cities and towns" from its operation, while there is no such exclusion in subsection 39.

It is true that clause 1 of chapter 2 of the *same act* declares that no public service corporation shall use, cross or occupy the streets of a city or town without the consent of the corporate authorities, but the two are to be construed together and made to harmonize, if it can be done, as is hereinafter pointed out with reference to the city charter. Subsections 38 and 39 are simply exceptions to the general power conferred in clause 1 of chapter 2, so far as the two apparently conflict.

We have hereinbefore expressed the view that "in the railroad" and "in the street" used in subsection

39, had reference to the party at whose instance, or for whose benefit, the improvement was asked.

The operation of subsection 39 on "existing crossings" in cities and towns cannot be excluded without doing violence to the language used in the subsection. As to future crossings, the city, as we have seen, had ample power to protect itself both by its charter and by clause 1 of chapter 2, *supra*, and it would have had like power over "existing crossings" also had not the legislature seen fit to deny it, as it had a perfect right to do.

[31, 32] Subsection 39 of section 1294-d of the Code of 1904 was enacted in 1904. At that time the city of Richmond and all other cities and towns of the State had general police powers over their streets. We are of opinion that subsection 39 was intended to curtail these powers to the extent indicated by its language. This section was in force at the time of the present controversy, and still is so far as it affects the question here at issue. But the charter of the city of Richmond was amended in 1908, and it is argued that this amendment operated as a repeal of subsection 39, so far as it affects the city of Richmond. It is conceded by counsel for the city that "no change was made" in the sections of the city charter existing in 1904 when subsection 39 was enacted. The amendment of 1908 granted no new powers as to changes of grades of railroads at "existing crossings," but was simply a continuation of the prior existing power, whatever that was.

The police powers conferred on the city of Richmond by its charter and continued in force by the amendment of 1908 was substantially the sam
eral powers conferred on all cities and towns in the State, and were not special and peculiar to that city. Subsection 39, by its terms, applies to all cities and

towns of the State. The charter of the city and subsection 39 must be construed together and made to harmonize, if possible, as repeals by implication are not favored. The general police powers conferred on the cities and towns are very large; while the restrictions imposed by subsection 39 are very limited. Construing subsection 39 with the charter of the city of Richmond, and charters of other cities and towns, the plain intention of the legislature was that the general and comprehensive powers conferred by the charter of the city of Richmond and of other cities and towns were to be unaffected except as to the improvements to be made at "existing crossings." Any other construction would render subsection 39 vain and useless so far as it affected cities and towns. Subsection 39 deals with the exercise of the police power under a special and peculiar state of facts, within the general police powers of cities and towns, but excepted from them, and, as was said in *Southern Ry. Co.* v. *Comth.*, 124 Va. 36, 56, 97 S. E. 343, 349, "A statute applicable to a special or peculiar state of facts must be treated as an exception to a general statute so comprehensive in its language as to cover all cases within the purview of the language used. In this way, and no other, can the two statutes be harmonized." Subsection 39 took away from the cities and towns their police powers as to cases arising thereunder, and these powers were not restored to the city by the amendment of its charter simply continuing preexisting powers. Subsections 38 and 39 embodied the public policy of the State, to be operative throughout the State, and, to the extent therein specified, the manner of its execution. The requirement that "the expense shall be borne equally" by the railroad and the county, city or town, under the conditions men-

tioned in subsection 39, is so explicit that it cannot be taken away except by enactment plainly showing such an intent. The amendment aforesaid of the charter of the city of Richmond is not such an enactment.

The record is not in such condition as to enable the court to enter judgment against the city for the proper amount. The judgment of the trial court, will, therefore, be reversed and a new trial awarded to the plaintiff in error, to be had in conformity to this opinion.

*Reversed.*